UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HARRIET HAREWOOD,

|                     Plaintiff,

                    -v.-

NEW YORK CITY DEPARTMENT OF
EDUCATION, ROBERT MERCEDES,
and ANDREA VARONA, *in their
individual and official capacities*,

|                     Defendants.

---

18 Civ. 5487 (KPF)

**OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Harriet Harewood brought this action against her former

employer, the New York City Department of Education (the "DOE"), as well as

Robert Mercedes and Andrea Varano (collectively, "Defendants"), who are,

respectively, the Principal and Assistant Principal of Middle School 390 ("MS

390").  In a prior decision, this Court adopted the Report and Recommendation

of United States Magistrate Judge Katharine H. Parker in dismissing certain of

Plaintiff's claims and allowing others to be repleaded.  *See Harewood* v. *N.Y.C.*

*Dep't of Educ.*, No. 18 Civ. 5487 (KPF) (KHP), 2019 WL 3042486 (S.D.N.Y.

May 8, 2019) ("*Harewood I*"), *report and recommendation adopted*, No. 18 Civ.

5487 (KPF), 2019 WL 2281277 (S.D.N.Y. May 29, 2019) ("*Harewood II*").[1]  After

---

[1]     In particular, the Court dismissed with prejudice Plaintiff's claims under the New York
        State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 to 297, and the New
        York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-131, as
        well as her claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1983, while it allowed
        Plaintiff to replead her claims under Title VII of the Civil Rights Act of 1964 ("Title VII"),
        and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 to 634.  *See*

extensive discovery, Defendants moved for summary judgment as to Plaintiff's remaining claims.  Pursuant to a second referral from this Court, Judge Parker issued a 40-page Report and Recommendation dated November 30, 2020 (the "Report," a copy of which is attached), recommending that Defendants' motion for summary judgment be granted in its entirety.  The Court has examined with care each of Plaintiff's objections to the Report and, for the reasons set forth in the remainder of this Opinion, adopts the Report in its entirety.

## BACKGROUND

### A.   Factual Background[2]

The Court adopts as accurate the statement of facts set out in the Report.  (Report 2-14).  In particular, the Court believes that Judge Parker has accurately summarized Plaintiff's remaining claims, and thus repeats that summary here:

> Plaintiff, a Black woman born in 1961, was a tenured art teacher in the New York City public school system. She worked at MS 390 in the Bronx from 1999 through June 2017, when she retired.  At the time she retired, she was one of the oldest staff members with the most seniority at the School.  As discussed below, she contends that commencing in the 2013-2014 school year, she was subjected to race and age-based discrimination in favor of younger and/or Hispanic staff

_____

*Harewood* v. *N.Y.C. Dep't of Educ.*, No. 18 Civ. 5487 (KPF) (KHP), 2019 WL 2281277 (S.D.N.Y. May 29, 2019) (adopting report and recommendation),

[2]   The facts here are drawn principally from the "Factual Background" section of the Report (Dkt. #84), and citations to this section include the record citations referenced therein.  For ease of reference, Plaintiff's Objections to the Magistrate Judge's Report and Recommendation will be referred to as "Objections" or "Pl. Obj." (Dkt. #88), and Defendants' Memorandum of Law in Opposition to Plaintiff's Objections will be referred to as "Def. Obj. Opp." (Dkt. #92).  Citations to Plaintiff's deposition will be referred to using the convention "Pl. Dep." (Dkt. #76-3 through 76-10), while citations to Defendant Mercedes's deposition will be referred to using the convention "Mercedes Dep." (Dkt. #76-12).  Other submissions will be cited by their docket entry number.

> culminating in her constructive discharge at the end of the 2016-2017 school year. She asserts that the discrimination was carried out by Robert Mercedes, the School's Principal, and Andrea Varona, the School's Assistant Principal. Mercedes was the Principal during the entirety of Plaintiff's tenure there. Varona began working as Assistant Principal in the 2015-2016 school year.

(*Id.* at 2 (footnotes and record citations omitted)). Because Plaintiff's objections contest certain of the factual underpinnings of the Report, the Court briefly summarizes the relevant background; to the extent that Plaintiff seeks to raise a genuine dispute of material fact in her Objections, the putative dispute is addressed in greater detail *infra.*

According to Plaintiff, the first form of age and/or race discrimination visited upon her by Defendants occurred in the 2013-2014 school year, and concerned reduced opportunities for "per session" work, for which she received additional income at an hourly rate. (Report 2-3). Having obtained per session work as a morning scheduler for several years, Plaintiff was replaced in the 2013-2014 school year by Jose Duran; Plaintiff notes that Mr. Duran is Hispanic, while Defendants note that Mr. Duran already had morning obligations, and could perform the scheduler function for no additional pay. (*Id.* at 3).[3]

Other developments in the 2013-2014 school year were cited by Plaintiff as evidence of discrimination, including changes to her lunch period; the

---

[3]     After Plaintiff retired, a younger, Hispanic employee, Guillermina Ceballos, was tasked with morning scheduler responsibilities, for which she received additional compensation. (Report 3 n.4).

addition of teaching periods to her work week; her reassignment to cover a homeroom class; and the administration's repeated failure to provide her with sufficient art supplies.  (Report 4).  Plaintiff came to believe that these episodes evinced age and/or race discrimination after (i) hearing Mercedes state in staff meetings that senior staff was "too expensive" and that he would reach out to DOE to effect the termination of senior staff, and (ii) observing several older and/or Black teachers leaving MS 390 during the school year.  (*Id.* at 4-6).

Plaintiff's problems continued into the 2014-2015 school year.  Plaintiff lost additional opportunities for per session income when (i) an afterschool art program with which she had previously been involved was terminated and never formally reinstated and (ii) Mercedes refused to authorize per session pay for Plaintiff to help students prepare for a bookmaking competition.  (Report 6-7).  In the spring of that year, Plaintiff lost her dedicated art classroom, ultimately requiring her to store her art supplies in various places and then cart them, as needed, into other teachers' classrooms.  (*Id.* at 7-8).

By the 2015-2016 school year, Plaintiff's lack of a dedicated classroom as well as certain physical limitations caused her to request a key to use MS 390's elevator.  Plaintiff received a key, and had use of it until June 2017, at which point Mercedes requested the return of all such keys.  (Report 8-9).  During the time she had the elevator key, however, Plaintiff believed that she was hassled unnecessarily about it.  (*Id.* at 9).  Other problems during the school year recalled by Plaintiff included (i) an incident in which a student in Plaintiff's writing class wrote disparaging comments about Plaintiff for which the student

was not disciplined; (ii) a change in Plaintiff's lunch period that resulted in her eating alone and without the ability to use a classroom; and (iii) Plaintiff's inability to use a room where certain Dominican staff members stored their lunches in a padlocked refrigerator.  (*Id.*).

One positive development from the 2015-2016 school year was Plaintiff's participation in an afterschool program called "GEAR-UP," administered by or under the auspices of Lehman College.  (Report 9).  Plaintiff enjoyed her work with the program, including the per session income it provided, but was unable to continue with the program in the 2016-2017 school year, when it switched to a Saturday schedule, which was a day Plaintiff preferred not to work.  (*Id.* at 10).  Other events of that school year cited by Plaintiff as evidence of Defendants' age and race discrimination included: (i) a new schedule that required her to pick up students from the lunchroom each day; (ii) allegations that Plaintiff had inflicted corporal punishment on a student, the investigation into which resulted in a disciplinary letter to Plaintiff; and (iii) less favorable teaching evaluations than Plaintiff had received in the past.  (*Id.* at 10-12).

As noted, Mercedes sought return of Plaintiff's elevator key in May 2017. (Report 12).  According to Plaintiff, the twin deprivations of a dedicated classroom and an elevator key, as well as other workplace stressors, caused her physical condition to worsen, resulting in her taking a leave of absence from May 28, 2017, to June 14, 2017.  (*Id.*).  Two weeks after her return, on June 28, 2017, Plaintiff received a second disciplinary letter, this time for alleged verbal abuse of her students.  (*Id.* at 13).  A few days later, on July 1,

2017, Plaintiff formally retired; she alleges in this case, however, that she was constructively discharged.  (*Id.*).

A few days after her retirement, Plaintiff filed a charge with the New York State Division of Human Rights (the "SDHR"), which charge was shared with the federal Equal Employment Opportunity Commission (the "EEOC"). (Report 13).  Approximately one year later, Mercedes requested that Plaintiff come back to MS 390 to discuss outstanding misconduct investigations — even though, according to Plaintiff, Mercedes had previously represented that such matters were closed.  (*Id.* at 14).  Plaintiff believed this request and the attendant notices she received to be retaliatory for the charges she filed.

## B.    Procedural History and Pretrial Motion Practice

Plaintiff filed her initial complaint in this Court on June 18, 2018, after receiving a right to sue letter.  (Dkt. #1).  The case was assigned to United States District Judge Robert W. Sweet.  Defendants moved to dismiss the complaint, and the motion was referred to Judge Parker for a Report and Recommendation after Judge Sweet's untimely passing.  (Dkt. #29).  The case was then reassigned to this Court on April 8, 2019.  (Minute Entry for April 8, 2019).

Judge Parker filed a Report and Recommendation regarding Defendants' motion to dismiss on May 8, 2019.  (Dkt. #37).  *See Harewood I*, 2019 WL 3042486.  In broad summary, Judge Parker recommended that this Court (i) dismiss Plaintiff's claim under 42 U.S.C. § 1981 with prejudice because it was unavailable as a matter of law against state actors, and (ii) dismiss

6

Plaintiff's claim under 42 U.S.C. § 1983 with prejudice for failure to state a claim. *Id.* at *9-11. She further recommended that the Court dismiss Plaintiff's state and local claims with prejudice pursuant to the election of remedies doctrine. *Id.* at *11. However, Judge Parker recommended that the Court dismiss Plaintiff's remaining claims under Title VII and the ADEA without prejudice, so that Plaintiff could replead them in an amended complaint. *Id.* at *4-9, 11. Neither side filed an objection to Judge Parker's May 8, 2019 Report and Recommendation, and this Court adopted it in full on May 29, 2019. (Dkt. #38). *See Harewood II*, 2019 WL 2281277.

Plaintiff filed a First Amended Complaint on June 14, 2019 (Dkt. #39), and a Second Amended Complaint on June 20, 2019 (Dkt. #43). The case then proceeded to discovery and an unsuccessful mediation. (*See, e.g.*, Dkt. #59 (letter requesting extension of discovery), 68 (mediator's report)). Defendants filed their opening papers in support of their motion for summary judgment on May 22, 2020 (Dkt. #72-76); Plaintiff filed her opposition papers on June 30, 2020 (Dkt. #77-79); and Defendants filed their reply papers on August 7, 2020 (Dkt. #83). The motion was referred to Judge Parker for a second Report and Recommendation. (Dkt. #71).

## C.    The Report and the Objections

Judge Parker issued the Report on November 30, 2020, recommending that Defendants' motion for summary judgment be granted in full. (Dkt. #84). Over approximately twelve pages, Judge Parker outlined those facts as to which there was no genuine dispute. (Report 2-14). She then proceeded to outline

7

the relevant legal standards for summary judgment motions, the statutes of limitations for Title VII and ADEA claims, and the burden-shifting paradigm for evaluating claims under both statutes that was first set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).  (*Id.* at 14-19).[4]

Preliminarily, Judge Parker recommended that the claims against Defendants Mercedes and Varona be dismissed, inasmuch as neither Title VII nor the ADEA provided for individual liability.  (Report 2 n.2).  Turning next to the limitations issue, Judge Parker noted that both Title VII and the ADEA required charges to be brought within 300 days of the alleged events of discrimination.  (*Id.* at 16-17 (collecting cases)).  Since Plaintiff filed her SDHR complaint on July 11, 2017, her claims for discriminatory events occurring prior to September 14, 2016, were time-barred.  (*Id.* at 17).  Judge Parker clarified, however, that such earlier episodes could be considered as "relevant background evidence to Plaintiff's timely claims" (*id.*), and could also be considered under a continuing violation theory (*id.*).

---

[4]     *See* Report 18:

> Under this framework, [i] a plaintiff must first establish a *prima facie* case of discrimination; (ii) if the employee does so, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.  If the employer satisfies its burden, the plaintiff must then show that the reasons presented were a pretext for impermissible motivation.  *Lenzi* v. *Systemax, Inc.*, 944 F.3d 97, 107-08 (2d Cir. 2019).  Under Title VII, the plaintiff asserting race discrimination must demonstrate that race was a motivating factor for the adverse employment action.  Under the ADEA, the plaintiff must demonstrate that age was the but-for cause of the adverse action.  *Brenner* v. *City of New York Dep't of Educ.*, 659 Fed. App. 52, 53-54 (2016); *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 105-06 (2d Cir. 2010).

Judge Parker then considered whether Plaintiff had stated a *prima facie* case for race or age discrimination, which would require Plaintiff to show that she was:

> [i] in the protected group, [ii] was qualified for the position and/or satisfied the employer's legitimate job expectations, [iii] suffered an adverse employment action and that [iv] the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

(Report 19 (citing *Stofsky* v. *Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 297 (S.D.N.Y. 2009))).  Judge Parker acknowledged the lack of dispute between the parties as to the first and second prongs, as contrasted with the considerable dispute between them over the third and fourth prongs.  From there, Judge Parker considered whether any of Defendants' actions after September 14, 2016, constituted an adverse employment action under Title VII or the ADEA; she concluded that Plaintiff's loss of per session income relating to the GEAR-UP program did not constitute an adverse action, while her loss of per session income derived from the afterschool portfolio program arguably qualified.  (*Id.* at 21-22).  The two disciplinary letters that Plaintiff received were deemed to constitute adverse employment actions because they hinted at additional disciplinary action and "could have reasonably contributed to Plaintiff's decision to retire early."  (*Id.* at 22-23).  Other actions — including less favorable performance evaluations, decreased funding for art supplies, the loss of a dedicated classroom, and Plaintiff's difficulties with her lunch period — were found not to constitute adverse actions.  (*Id.* at 23-26).

Judge Parker next considered whether Plaintiff had presented evidence that each of the adverse actions occurred under circumstances giving rise to an inference of race or age discrimination, and assumed for purposes of the analysis that Plaintiff had satisfied that requirement. (Report 26). Reflecting the shifting of burdens under *McDonnell Douglas*, Judge Parker then catalogued the evidence supporting the DOE's proffered non-discriminatory explanation for each action: Mercedes chose to terminate the afterschool art portfolio program because of budgetary constraints, in particular, because "it was too costly and reached too few students to warrant the money." (*Id.* at 26). Furthermore, each disciplinary letter to Plaintiff followed a formal investigation into allegations of misconduct in which Plaintiff was afforded an opportunity to respond. (*Id.* at 27).

At this point, Judge Parker refocused her attention on Plaintiff to consider her evidence of pretext. With respect to the program termination, Plaintiff argued that Defendants "offered other younger and/or Hispanic teachers per session opportunities"; Judge Parker, however, found "absolutely no evidence that younger and/or Hispanic teachers were permitted per session opportunities for programs with a limited student to teacher ratio similar to Plaintiff's former portfolio program." (Report 28). A similar conclusion was reached with respect to the putative comparator teachers that Plaintiff claims were, or should have been, subject to discipline. (*Id.* at 30). Also with respect to the disciplinary letters, Judge Parker found that Plaintiff had presented only "limited evidence to undermine the findings of the investigations. Moreover,

10

the record is devoid of any evidence demonstrating that the adverse letters were issued for a discriminatory reason; rather, students complained about Plaintiff's conduct, which led to investigations and disciplinary letters." (*Id.* at 29). Given these deficiencies in the record, Judge Parker recommended that Plaintiff's disparate treatment claims under Title VII and the ADEA be dismissed.

Judge Parker then examined the evidence undergirding Plaintiff's hostile work environment claims, in order to determine whether Plaintiff had "show[n] that the complained of conduct: [i] is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; [ii] creates an environment that the plaintiff subjectively perceives as hostile or abusive; and [iii] creates such an environment because of the plaintiff's [race, national origin, or age]." (Report 30-31 (citing, *inter alia*, *Patane* v. *Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (alterations supplied)). While acknowledging that Plaintiff had listed a number of ostensibly hostile acts occurring over a period of approximately four years, Judge Parker concluded that: (i) Plaintiff had presented no evidence that MS 390 administrators had "made racially discriminatory or ageist remarks to or about Plaintiff or otherwise" (*id.* at 32); (ii) the acts of which Plaintiff complained were too "episodic" to support a hostile work environment claim (*id.* at 33); and (iii) Plaintiff had failed to present evidence sufficient to raise a genuine dispute that any of the conduct was motivated by age or race animus (*id.* at 34-37). Here, too, Judge Parker

11

recommended that the Court grant summary judgment as to Plaintiff's claims, as well as her related claims of constructive discharge.  (*Id.* at 37).

Finally, Judge Parker considered Plaintiff's claims that the disciplinary notices she received in May 2018, after she had retired, were retaliation for administrative charges that she filed in July 2017.  (Report 37-40).  While recognizing that "adverse action" in the retaliation context was broader than its disparate treatment counterpart, Judge Parker nonetheless found that the sending of notices to Plaintiff long after her retirement (and long after her filing of administrative charges) and with no professional consequences to her offered no basis for a reasonable jury to find retaliation under Title VII or the ADEA. (*Id.* at 39).  Judge Parker further cited record evidence indicating that Mercedes had, or reasonably perceived himself to have had, an obligation to send these notices.  (*Id.* at 39-40).  At the conclusion of the Report, Judge Parker recommended that the Court grant Defendants' motion for summary judgment in full.

Plaintiff filed her Objections to the Report on December 14, 2020 (Dkt. #85), and filed a corrected version of the same on December 18, 2020 (Dkt. #88).  Defendants filed a brief opposing Plaintiff's Objections on December 30, 2020.  (Dkt. #92).

## DISCUSSION

### A.  The Standard of Review

A court may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge.  *See* 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72(b); *Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989).  More specifically, a court may accept those portions of a report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings are not clearly erroneous.  *See Ramirez* v. *United States*, 898 F. Supp. 2d 659, 663 (S.D.N.Y. 2012) (citation omitted).  In this regard, a magistrate judge's decision is clearly erroneous only if the district court is "'left with the definite and firm conviction that a mistake has been committed.'"  *Easley* v. *Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

When a timely and specific objection has been made, the court is obligated to review the contested issues *de novo*.  *See* Fed. R. Civ. P. 72(b)(3); *Hynes* v. *Squillace*, 143 F.3d 653, 656 (2d Cir. 1998).  But when the objections simply reiterate previous arguments or make only conclusory statements, the court should review such portions of the report only for clear error.  *See Dickerson* v. *Conway*, No. 08 Civ. 8024 (PAE) (FM), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *see also Kirk* v. *Burge*, 646 F. Supp. 2d 534, 538 (S.D.N.Y. 2009) (collecting cases).  Further, "[c]ourts generally do not consider new evidence raised in objections to a magistrate judge's report and recommendation."  *Tavares* v. *City of New York*, No. 08 Civ. 3782 (PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011) (collecting cases).

**B.    Analysis**

**1.    The Court Finds No Clear Error**

While Plaintiff offers a litany of objections to the Report, a careful review
discloses that they are little more than a reworking of arguments Plaintiff made
in opposition to Defendants' summary judgment motion.  (*Compare* Objections,
*with* Dkt. #79).  *See Vega* v. *Artuz*, No. 97 Civ. 3775 (LTS) (JCF), 2002 WL
31174466, at *1 (S.D.N.Y. Sept. 30, 2002) ("However, objections that are merely
perfunctory responses argued in an attempt to engage the district court in a
rehashing of the same arguments set forth in the original petition will not
suffice to invoke *de novo* review of the magistrate's recommendations.").  As
other courts have noted, accepting and reviewing objections of this kind *de
novo* "would reduce the magistrate's work to something akin to a meaningless
dress rehearsal."  *Id.* at *1 (internal quotations marks and citations omitted);
*see also id.* ("The purpose of the Federal Magistrates Act was to promote
efficiency of the judiciary, not undermine it by allowing parties to relitigate
every argument which [they] presented to the Magistrate Judge." (internal
quotation marks and citations omitted)).

Judge Parker carefully reviewed the parties' factual and legal
submissions.  She then drafted a 40-page Report that identified the facts not in
dispute, and that explained why putative disputes that had been identified by
the parties either were not actual disputes (such as where a party had
misperceived the record, *see, e.g.*, Report 21, 23 n.9) or were not material
disputes (*see, e.g.*, *id.* at 8 n.5).  Judge Parker correctly stated the applicable

14

law and then conscientiously applied that law to the admissible evidence identified by the parties.  This Court identifies no error, much less clear error, in her analysis.

### 2.    The Court Finds No Error in the Report After *De Novo* Review

In the interests of completeness, however, this Court has also conducted a *de novo* review of those portions of the Report to which Plaintiff has lodged an objection.  As part of that review, the Court reviewed not merely the parties' briefing concerning Plaintiff's Objections, but also the totality of the parties' briefing and exhibits concerning Defendants' motion for summary judgment.

### a.    Summary Judgment Standards

Though the Court does not understand the parties to be disputing the relevant law, it reproduces that law here nonetheless for the convenience of the reader.  Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[5]  A genuine dispute exists where "the evidence is such that a reasonable jury could return

---

[5]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word – genuine 'issue' becomes genuine 'dispute.' 'Dispute better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246. 252 (2d Cir. 2001).  Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456

(2d Cir. 1995)).  "Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks*, 593 F.3d at 166.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.  "If the evidence is merely colorable … or is not significantly probative … summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

It should also be noted that "the principles governing admissibility of evidence do not change on a motion for summary judgment. …  [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).  To the extent a party's Local Civil Rule 56.1 Statement includes assertions that are unsupported by cited materials or otherwise conclusory, such assertions are insufficient to create a genuine dispute of material fact.  *See Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[T]he Court may not rely solely on the statement of undisputed facts contained in [a] party's Rule 56.1 statement; it also must be satisfied that the … party's assertions are supported

by the record." (citing *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." *Gorzynski*, 596 F.3d at 101 (internal quotation marks omitted) (quoting *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008)). "Where an employer acted with discriminatory intent, 'direct evidence of that intent will only rarely be available, so ... affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* Nevertheless, "[f]or a plaintiff to survive a motion for summary judgment in a discrimination case, she must offer concrete particulars to substantiate her claim." *Stathalos* v. *Gala Res., LLC*, No. 06 Civ. 13138 (RLC), 2010 WL 2024967, at *4 (S.D.N.Y. May 21, 2010) (internal citations and quotation marks omitted). "The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri* v. *Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

Before addressing the specifics of Plaintiff's Objections, the Court observes that they suffer generally from two doctrinal flaws. *First*, Plaintiff argues that this Court should disbelieve the testimony of Defendant Mercedes, particularly insofar as Defendants offer excerpts of that testimony as evidence of non-discriminatory reasons for the adverse actions of which Plaintiff complains. (*See* Pl. Obj. 10-12, 13, 14). The law is clear, however, that "it is

not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (internal quotation marks, alteration, and ellipsis omitted); *see also Cross* v. *N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) (noting that plaintiff must prove discrimination "'was the real reason' for any adverse employment action" (quoting *Schnabel* v. *Abramson*, 232 F.3d 83, 87 (2d Cir. 2000))).  The Court will not reject Mercedes's testimony, even if unaccompanied by documentary substantiation, as a matter of course; rather, the Court has examined the record to see if Plaintiff has presented sufficient admissible evidence to raise a triable issue as to any of her claims.[6]

*Second*, Plaintiff seeks to prove her claims of race and age discrimination by proffering a group of former MS 390 faculty and staff members as "similarly situated" to her.  (*See, e.g.*, Pl. Obj. 13 ("There are just too many adverse actions so closely in time at the end of her teaching career, similar to the many colleagues identified in the record subject to similar treatment, to believe that these actions were not taken due to race or age based animus.")).  But such

---

[6]     Plaintiff also suggests that the Court should discredit Mercedes's testimony because of at least one discrepancy in dates, *i.e.*, whether a particular meeting or group of meetings took place in January or June of 2015 (*see, e.g.*, Mercedes Dep. 71-72, 168-69 (addressing discrepancy in dates); Pl. Obj. 5; Dkt. #77 at ¶ 46), or because of confusion about the source of funding for art supplies (*see, e.g.*, Mercedes Dep. 65, 78, 166; Dkt. #77 at ¶¶ 77-80).  Even were the Court to accept that Mercedes's recollection was incorrect on either or both of these points, this evidences neither a basis to reject his testimony in its entirety nor discriminatory animus.

sweeping statements overlook the numerous cases defining who may serve as a

proper comparator in Title VII and ADEA cases:

> While similarly situated employees who receive different treatment can be evidence of discrimination, the employees "must be similarly situated in all material aspects." *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). To satisfy the "all material respects" requirement, a plaintiff must show that similarly situated employees "engaged in comparable conduct," meaning there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," such that "the conduct for which the employer imposed discipline was of comparable seriousness" to the conduct of the similarly situated but undisciplined employees. *Graham* v. *Long Island Railroad*, 230 F.3d 34, 40 (2d Cir. 2000).

*Jordan* v. *United Health Grp. Inc.*, 783 F. App'x 31, 33 (2d Cir. 2019) (summary

order).[7]

---

[7]     The Second Circuit's detailed discussion of this issue in the context of veterinarians is readily transferable to the school setting:

> As aptly noted by the district court, Chiaramonte's efforts to draw comparisons between her positions and those of her five co-workers "miss the mark because they essentially require the [c]ourt to embrace the principle that the work of all veterinarians is equivalent, thereby ignoring distinctions among the different specialties in veterinarian medicine." S. App'x at 28. That basis for demonstrating equal work has been expressly foreclosed by this Court. *See* [*E.E.O.C.* v. *Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014)]. The focus of the equal work inquiry is "on the congruity and equality of actual job content between the plaintiff and comparator." *Id.* The fact that Chiaramonte and the alleged comparators are department heads whose positions share some common responsibilities is insufficient to demonstrate substantially equal work in light of the drastic differences in job content — that is, the differences in specialties, patient loads, supervision, teaching, and research contributions. *See, e.g.*, *Fisher* v. *Vassar College*, 70 F.3d 1420, 1452 (2d Cir. 1995) (reversing judgment in favor of plaintiff asserting an EPA claim because — although she and her better-paid male co-worker were both college professors — the plaintiff "never introduced evidence establishing that she and [her coworker] performed equivalent work"), *abrogated on other grounds by Reeves* v. *Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed.2d 105 (2000); *see also Byrne* v. *Telesector Res. Grp., Inc.*, 339 Fed. Appx.

### b.   The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Disparate Treatment Claims[8]

The Court begins, as Judge Parker did, by addressing Plaintiff's claims of age- and race-based disparate treatment.  Title VII provides that "it shall be an unlawful employment practice for an employer … to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The ADEA provides that "it shall be unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

Discrimination claims under Title VII and the ADEA are governed by the aforementioned burden-shifting framework set forth in *McDonnell Douglas*.  *See Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82-83 (2d Cir. 2015); *see also Gorzynski*, 596 F.3d at 106.  Under this framework,

---

13, 16 (2d Cir. 2009) (summary order) (affirming summary judgment in favor of defendant, notwithstanding that plaintiff and higher-paid male co-workers had same job title, because "[f]or purposes of an equal pay claim ... a finding of substantial equality must be based on actual job content").  Other than the broad generalizations drawn from the fact that the alleged comparators are department heads and veterinarians, their work content is simply not equivalent to that of Chiaramonte.

*Chiaramonte* v. *Animal Med. Ctr.*, 677 F. App'x 689, 691-92 (2d Cir. 2017) (summary order).

[8]   It is unclear whether Plaintiff's Objections include an objection to Judge Parker's recommendation that the claims against the Individual Defendants be dismissed.  Because neither Title VII nor the ADEA provides for individual liability, the Court will dismiss those claims.  *See Wickes* v. *Westfair Elec. Co.*, No. 19 Civ. 10673 (PMH), 2021 WL 217318, at *6 (S.D.N.Y. Jan. 20, 2021) (collecting cases).

> the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  If the plaintiff does so ... the defendant [must] articulate some legitimate, nondiscriminatory reason for its action.  If such a reason is provided, plaintiff ... may still prevail by showing ... that the employer's determination was in fact the result of [discrimination].

*Holcomb*, 521 F.3d at 138 (internal quotation marks and citations omitted).

To establish a *prima facie* case of discrimination under both Title VII and the ADEA, a plaintiff must show (i) she is a member of a protected class; (ii) she is qualified for her position; (iii) she suffered an adverse employment action; and (iv) the circumstances give rise to an inference of discrimination.  *See Vega*, 801 F.3d at 83; *see also Gorzynski*, 596 F.3d at 107.  Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discrimination.  *See Patterson* v. *Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).  "Defendants' burden at this stage is not to prove nondiscrimination.  Instead, defendants must introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  *Albuja* v. *Nat'l Broad. Co. Universal*, 851 F. Supp. 2d 599, 610 (S.D.N.Y. 2012) (internal quotation marks omitted).

If the employer articulates a legitimate, nondiscriminatory reasons for the adverse action, "the burden shifts back[9] to the plaintiff to prove that the

---

[9]     Although it has little practical effect in this case, the Court notes that when the Second Circuit discusses the third step of the *McDonnell Douglas* framework in the ADEA context, it has said that the plaintiff "can no longer rely on the *prima facie* case, but must prove that the employer's proffered reason was a pretext for discrimination."  *See Delaney* v. *Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (internal citations and

employer's reason 'was in fact pretext' for discrimination." *Vega*, 801 F.3d at 83 (citing *McDonnell Douglas*, 411 U.S. at 804).  At this final stage, the standards for Title VII claims and ADEA claims diverge.  *See Gorzynski*, 596 F.3d at 106.  In the Title VII context, the plaintiff "must establish 'circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'"  *Sullivan* v. *N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 99 (S.D.N.Y. 2016) (quoting *Kirkland* v. *Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).  ADEA claims face a higher standard — the plaintiff must prove, by a preponderance of the evidence, that age was the "but-for" cause of the adverse action, as opposed to merely being a motivating factor.  *See Gorzynski*, 596 F.3d at 106 (quoting *Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

In her Objections, Plaintiff appears to agree with Judge Parker that the adverse employment actions against her include the denial of per session income for the afterschool art portfolio program and the two disciplinary letters she received (*see* Pl. Obj. 9-12), but Plaintiff also seeks to include in this category the loss of per session income from the GEAR-UP program, her failure to receive adequate art supplies, and her loss of a dedicated classroom (*see id.* at 9-10).  After reviewing the record, this Court agrees with Judge Parker that

---

quotation marks omitted) (citing *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010); *McPherson* v. *N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)). This stands in contrast to the Second Circuit's language in Title VII cases, wherein it refers to the burden shifting back to the plaintiff.

none of those events constitutes an adverse action.  Proceeding in order, the Court finds that Plaintiff has not and cannot raise a material dispute regarding the fact that Lehman College, and not Defendants, administered the GEAR-UP program.  (*See* Mercedes Dep. 102-19, 184-86; Dkt. #76-24, 76-25). Conversely, there is no evidence in the record supporting Plaintiff's assertion that a "favored Hispanic colleague" conspired with Mercedes to change the program from a weekday to a weekend format that was "not convenient for Plaintiff." (Pl. Obj. 9).  Instead, the record reflects that Lehman College made the decision to move the program to Saturdays (Dkt. #78-27), and that Plaintiff declined to apply for a Saturday program (Pl. Dep. 200-14).

The Court similarly cannot find that Plaintiff's art supply and dedicated classroom issues constitute adverse actions.  Record evidence makes clear that Plaintiff always received art supplies, and that the degree to which her requests were not fully met was reflective of budgetary issues and not personal discord. (*See, e.g.*, Pl. Dep. 216; Mercedes Dep. 78, 166; Dkt. #78-17, 78-20, 78-23). There is as well abundant evidence, including substantial contemporaneous documentation and deposition testimony, regarding the need to repurpose Plaintiff's dedicated classroom.  (*See, e.g.*, Dkt. #76-21, 76-22; Mercedes Dep. 79-80, 87, 100).  And as Judge Parker noted, the loss of a classroom would amount to an adverse action only if the "lack of a permanent classroom was 'more disruptive than a mere inconvenience' and had a 'sufficiently deleterious' effect on [Plaintiff's] ability to perform her job responsibilities." (Report 24).  *See Gordon* v. *N.Y.C. Bd. of Educ.*, No. 01 Civ. 9265 (SAS), 2003

WL 169800, at *7 (S.D.N.Y. Jan. 23, 2003) (quoting *Galabya* v. *N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

Having identified three adverse employment actions, and having accepted, for purposes of analysis, that Plaintiff has made the *de minimis* showing that each occurred under circumstances giving rise to an inference of age or race discrimination, the Court considers Defendants' proffered non-discriminatory reasons for each.  To begin, the Court finds sufficient evidence supporting Defendants' explanation that the afterschool portfolio program was cut for budgetary reasons, in particular, because the relative number of students served by the program was less than other per session items.  (*See, e.g.*, Mercedes Dep. 68 (stating that he declined to authorize the program "[w]hen it bec[a]me too costly, because the teacher per ratio for after school activities with the children was like 12 to 1 and 15 to 1.  And [to] allocate per session for three or four students is not really [fiscally] responsible")).  *See generally Moccio* v. *Cornell Univ.*, 889 F. Supp. 2d 539, 579 (S.D.N.Y. 2012) (accepting evidence of budgetary constraints as legitimate basis for termination), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (summary order).

Defendants also presented sufficient evidence of non-discriminatory reasons for issuing each of the disciplinary letters.  With respect to the investigation into alleged corporal punishment, Plaintiff acknowledged that she pushed the student in question, even if the student pushed first.  (*See* Pl. Dep. 92 ("And she jumped up, 'you just spit on me' and she pushed me like that really hard and I went back like that and when I came back, I pushed her back

25

and that was it.")); Dkt. #76-39 ("I reacted and pushed [student] back."), *see also, e.g.*, Dkt. #76-35, 76-38, 78-30, 78-33, 78-34, 78-36, 78-51; Mercedes Dep. 196-97; Pl. Dep. 90-94).  With respect to the second incident, Plaintiff acknowledged telling students after a classroom observation that "I don't want to be accused of having favorites in the class," after which certain of the students complained that Plaintiff's comments amounted to verbal abuse and intimidation. (*See* Pl. Dep. 147; *see also, e.g.*, Pl. Dep. 143-55; Mercedes Dep. 197; Dkt. #76-36).  And in any event, as Judge Parker concluded, "Mercedes met with Plaintiff and her union representative and afforded her an opportunity to respond to the allegations against her.  Mercedes concluded that the claims against Plaintiff were credible based on his investigations and clearly articulated the basis for his findings in each letter." (Report 27 (record citations omitted)).  Defendants have therefore satisfied their burden of articulating legitimate, non-discriminatory reasons for the adverse actions.

The burden shifted to Plaintiff to prove that Defendants' proffered reasons were a pretext for discrimination; under either the Title VII or the ADEA standard, Plaintiff failed to identify a genuine dispute of material fact.  In her summary judgment papers, Plaintiff offered little in the way of evidence undermining the veracity of Defendants' claims; in her Objections, she is similarly short on words, arguing conclusorily that the timing of the disciplinary letters was "suspicious" (Pl. Obj. 11), and that Defendants' budgetary constraints were "fabricated and exaggerated" (*id.*).  But assertions without evidence are an inadequate basis to raise a triable issue of fact.

Plaintiff also repeats her claim that Mercedes is not a credible witness (*id.* at 10), but offers little in the way of record evidence to back up that assertion.[10]

Throughout her pleadings, her deposition, and her motion papers, Plaintiff argues that Mercedes embarked on a campaign to drive older, non-Hispanic teachers and staff out of MS 390.  (*See generally* Dkt. #79 (Memorandum in Opposition to Motion for Summary Judgment); Dkt. #77 (Counterstatement of Material Facts); Pl. Obj.).  As an initial matter, these arguments are difficult to reconcile with the applicable timeline, since Mercedes has been principal of MS 390 since 1999; chose Plaintiff to remain at MS 390 when her prior school, MS 330, was phased into MS 390 that same year; and, even by Plaintiff's reckoning, did not begin to engage in discriminatory conduct towards her until 2013.  (*See* Dkt. #77 at ¶¶ 7-13; *see also* Pl. Dep. 46 ("In the beginning, [Mercedes] was a fair supervisor until the last year I was there.")).

More to the point, Plaintiff's efforts to analogize her situation to comparators of the same race or age falls flat:  Plaintiff peppers her complaint and her deposition testimony with references to former MS 390 personnel, and generalized assertions regarding how they were targeted by Mercedes, but completely fails to demonstrate that they are similarly situated to her.  This failure is not surprising to the Court, inasmuch as Plaintiff was the only art

---

[10]     In this regard, the Court agrees with Judge Parker that the materials excerpted from "See Through NY," a website that appears to provide New York State teacher salary information, were inadmissible hearsay (*see* Report 28 n.10), and agrees with Defendants that Plaintiff cannot raise in her Objections an argument that certain art studio funding could have been allocated to fund her afterschool program (*see* Def. Obj. Opp. 10-11).

teacher at MS 390 during the relevant period, and was qualitatively different from other teachers and staff.  But Plaintiff barely attempts to draw comparisons.  To the contrary, many of the proffered comparators — who were fired and/or asked to leave by Mercedes at various points in his tenure as principal — differ from Plaintiff on that very point.  (*See, e.g.*, Pl. Dep. 112-27, 140, 193-95, 277 (discussing former MS 390 teachers and staff); Mercedes Dep. 71-72, 230-38 (discussing MS 390 teachers and staff he had fired)).  There is simply nothing in the record, even giving Plaintiff the benefit of every inference, that suggests that Defendants' proffered explanations were a pretext for discrimination.  Summary judgment is warranted as to Plaintiff's disparate treatment claims.

> **c.    The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Hostile Work Environment and Constructive Discharge Claims**

The Court applies the same standard to hostile work environment claims under Title VII and the ADEA.  *See Terry* v. *Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citing *Brennan* v. *Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).  Plaintiff must show that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Wiercinski* v. *Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007).  The standard has both objective and subjective components: "[T]he conduct complained of must be severe or pervasive enough

that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo* v. *Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Terry*, 336 F.3d at 148 (quotation marks omitted); *see also Desardouin* v. *City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (noting that such evidence may include a single and "extraordinarily severe" incident or a series of "sufficiently continuous and concerted" incidents (citations omitted)).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including, among others, (i) "the frequency of the discriminatory conduct"; (ii) "its severity"; (iii) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (iv) "whether it unreasonably interferes with an employee's work performance." *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Even so, a claim will only lie if the plaintiff "can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class." *Bermudez* v. *City of New York*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011). That is because "[h]ostile work environment claims are meant to protect individuals from abuse and trauma that is severe," but "[t]hey are not intended to promote or enforce civility, gentility or even decency." *Isbell* v. *City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018); *see also Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006) (observing that Title VII does not set forth "a

general civility code for the American workplace"); *Almontaser* v. *N.Y.C. Dep't of Educ.*, No. 13 Civ. 5621 (ILG) (VMS), 2014 WL 3110019, at *8 (E.D.N.Y. July 8, 2014) (applying the principle to the ADEA).[11]

Plaintiff begins her Objections to this section of the Report by noting that Judge Parker "properly recognized ... at least *20* adverse actions against Plaintiff, all within the last 3-4 years of her employment." (Pl. Obj. 13). This, however, is an overstatement. Judge Parker combed through Plaintiff's submissions to find those acts that Plaintiff claimed supported her hostile work environment claim. After reviewing them in the aggregate, she concluded that

> the various acts about which Plaintiff complains such as changes to her lunch period, non-approval of the book-making program, and hassling her about the elevator key, are episodic and not the type of conduct that courts find create severe or pervasive hostile work environments. Even the two negative performance reviews and two discipline letters in her last year are not sufficiently severe or pervasive to give rise to a hostile work environment claim as a matter of law.

(Report 33-34). This Court agrees. However numerous, these acts, even taken together, fail to demonstrate a "hostile" or "abusive" environment under *Harris*.

---

[11]   Plaintiff's constructive discharge claim is subject to an even higher standard:

> "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Fincher* v. *Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (internal quotation marks omitted). The standard for such a constructive discharge is "higher than the standard for establishing a hostile work environment." *Id.*

*Kunik* v. *N.Y.C. Dep't of Educ.*, — F. App'x —, No. 20-741-cv, 2021 WL 137882, at *2 (2d Cir. Jan. 15, 2021), *as amended* (Jan. 26, 2021) (summary order).

Plaintiff's efforts to transform this laundry list of slights and inconveniencies into an actionable hostile work environment claim suffers from deficiencies both of evidence and of logic.  Once again, Plaintiff asks the Court to discredit Mercedes's testimony despite the absence of contradictory evidence, based on Plaintiff's bald assertion that Mercedes had an "agenda to drive out older non-Hispanic teachers from the school."  (Pl. Obj. 13).[12]  And once again, Plaintiff asks the Court to accept her word that Mercedes had a "pattern of targeting dozens of other non-Hispanic senior staff members in similar fashion" (*id.*), when Plaintiff has presented only scattershot evidence of names, perceived races, and perceived ages, with no effort to link the prior terminations to each other or to what happened to her.  What is more, two judges have now combed this record looking for evidence that the events of which Plaintiff complains were occasioned by age- or race-based discriminatory animus, and both judges have come up empty.  Plaintiff has simply failed to adduce evidence sufficient to raise a triable issue on whether any of the conduct of which she complains was motivated by age- or race-based animus.  For all of these reasons, the Court grants summary judgment in favor of

---

[12]    Plaintiff suggests that Judge Parker created

> nearly an impossible burden for anything to get to trial … whereby it is inviting a Plaintiff to make up facts to stand any real chance to get in front of a jury; in contrast, a principal can say anything (whether credible or not and backed by no documentary evidence) to avoid culpability.

(Pl. Obj. 14).  Not so.  Judge Parker was merely following long-established precedent for resolving summary judgment motions that requires admissible evidence (which can include a party's sworn testimony) and not unsupported ruminations.  *See supra* at 15-18.

Defendants as to Plaintiff's hostile work environment and constructive discharge claims.

### d.   The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Retaliation Claims

That leaves Plaintiff's claims of retaliation.  Under Title VII and the ADEA, Plaintiff must demonstrate that: (i) she engaged in protected activity; (ii) Defendants were aware of that activity; (iii) she suffered a materially adverse action; and (iv) there was a causal connection between the protected activity and that adverse action.  *Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam).  Significantly, a plaintiff "alleging retaliation in violation of [either statute] must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Zann Kwan*, 737 F.3d at 846 n.5 (citing *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 348, 360 (2013)).[13]

An employment action is materially adverse if it would have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (quoting *Rochon* v. *Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "Actions that are 'trivial harms' — *i.e.*, 'those petty slights or minor annoyances that often take place at work and that

---

[13]   If the plaintiff makes that showing, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action.  *See Davis-Garett* v. *Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019).  If the defendant carries that burden, the presumption of retaliation drops out of the picture and the plaintiff must demonstrate that the defendant's proffered reason is a mere pretext for retaliation.  *See Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

all employees experience' — are not materially adverse." *Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph* v. *Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006); *see also Brown* v. *City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien*, 663 F.3d at 568 (citing *Hicks*, 593 F.3d at 165).

In her Second Amended Complaint and in her summary judgment opposition, Plaintiff argued that her receipt of disciplinary notices in May 2018 — after Mercedes had told her that the matters were closed and after she had filed an administrative charge with the SDHR — sufficed to raise a genuine dispute of material fact as to retaliation. (*See* Dkt. #43 at ¶ 63; Dkt. #79 at 27-28). Judge Parker recommended summary judgment, noting (i) the absence of an adverse action to Plaintiff, (ii) the substantial passage of time between the filing of the charge and the receipt of the notices, and (iii) the record evidence that Mercedes believed he had an obligation to send the notices. (Report 39-40; *see also* Mercedes Dep. 201-07 (testifying, *inter alia*, that "part of that

closing out [of the disciplinary reports] is that, you know, the person has to come in and actually provide a statement as to why the action was taken")).

In her Objections, Plaintiff tries a different tack, arguing for the first time that the Court should look to April 2018, when Plaintiff received her right to sue letter, as the date of the protected activity.  (Pl. Obj. 14).  Unfortunately for Plaintiff, her receipt of that letter, while concededly closer in time to the notices, does not qualify as protected activity.  *See Green* v. *Mount Sinai Health Sys., Inc.*, No. 17 Civ. 3999 (VEC), 2019 WL 4392691, at *6 (S.D.N.Y. Sept. 12, 2019) ("It is well-established, however, that the receipt of a right-to-sue letter, as distinguished from the filing of the EEOC charge to which the letter relates, is not protected activity." (collecting cases)), *aff'd*, 826 F. App'x 124 (2d Cir. 2020) (summary order); *accord Pocino* v. *Culkin*, No. 09 Civ. 3447 (RJD) (RLM), 2010 WL 3516219, at *3 (E.D.N.Y. Aug. 31, 2010) ("Protected activity under the ADEA includes opposing or charging unlawful practices, or participating in any manner in the investigation, proceedings or litigation of an ADEA claim." (collecting cases for proposition that receipt of right to sue letter is not protected activity)).  In all other respects, this Court agrees with Judge Parker's analysis of Plaintiff's retaliation claims and her ultimate recommendation for their dismissal.

**CONCLUSION**

For the foregoing reasons, the Court adopts the Report in full, and grants summary judgment in favor of Defendants as to all of Plaintiff's claims.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:   February 22, 2021
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

HARRIET HAREWOOD,

                                         Plaintiff,

                    -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,
ROBERT MERCEDES,
*in his official and individual capacity as*
*Principal of Middle School 390,*
ANDREA VARONA,
*in her official and individual capacity as*
*Assistant Principal of Middle School 390,*

                                         Defendants.
-----------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 11/30/2020

**18-cv-05487 (KPF) (KHP)**

**REPORT & RECOMMENDATION**

**TO: THE HONORABLE KATHERINE POLK FAILLA, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Harriet Harewood brings this action against her former employer, the New York

City Department of Education ("DOE"), and the Principal and Assistant Principal of Middle

School 390 ("MS 390" or the "School"), the middle school where she worked (collectively,

"Defendants").  She alleges race and age discrimination claims against Defendants under Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, respectively.[1]  (ECF No. 43,

Second Amended Complaint ("SAC").)  She also alleges retaliation under both laws.  (*Id.*)

---

[1] Plaintiff filed this action on June 18, 2018.  Her New York State Division of Human Rights ("SDHR") and EEOC
Charge was filed on July 11, 2017, shortly after she retired.  Her notice of right to sue was issued on April 12, 2018.

Discovery now having been completed, Defendants have moved for summary judgment. (ECF No. 72.)  For the reasons set forth below, I respectfully recommend that Defendants' motion be GRANTED.

## FACTUAL BACKGROUND

Plaintiff, a Black woman born in 1961, was a tenured art teacher in the New York City public school system.  She worked at MS 390 in the Bronx from 1999 through June 2017, when she retired.  (56.1 Counter Statement ("56.1") ¶¶ 1, 4, 13.)  At the time she retired, she was one of the oldest staff members with the most seniority at the School.  (SAC ¶ 11.)  As discussed below, she contends that commencing in the 2013-2014 school year, she was subjected to race- and age-based discrimination in favor of younger and/or Hispanic staff culminating in her constructive discharge at the end of the 2016-2017 school year.  She asserts that the discrimination was carried out by Robert Mercedes, the School's Principal, and Andrea Varona, the School's Assistant Principal.[2]  Mercedes was the Principal during the entirety of Plaintiff's tenure there.  (56.1 ¶ 12.)  Varona began working as Assistant Principal in the 2015-2016 school year.[3]  (56.1 ¶ 14.)

### 1.  2013-2014 School Year

The earliest discrimination Plaintiff says she faced pertained to per session work. Teachers earn extra money through per session work, which is generally defined as "any activity

---

[2] Although both Mercedes and Varona are listed as Defendants in the SAC, it is well established that individuals cannot be liable for discrimination under Title VII or the ADEA. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (Title VII); *Martin v. Chemical Bank*, 129 F.3d 114 (2d Cir. 1997) (ADEA); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 252 (E.D.N.Y. 2012) (dismissing discrimination claims against individual school administrators). Therefore, to the extent they are still intended defendants, the claims should be dismissed against them.

[3] Varona worked as a librarian at the School the year prior.  (ECF No. 78, Glass Declaration ("Glass Decl.") Ex. 3)

in which pedagogical, pupil personnel service providers and supervisory employees are paid at an hourly rate depending on their particular title."

https://www.schools.nyc.gov/careers/other-jobs-in-schools/per-session-jobs (last visited Nov. 30, 2020).  Mercedes offered Plaintiff the opportunity to receive per session work as the morning scheduler at the beginning of the 2010-2011 school year.  (56.1 ¶ 15.)  As morning scheduler, Plaintiff took teacher attendance and scheduled substitute teachers as needed. (56.1 ¶ 16.)  Plaintiff worked as the morning scheduler for three consecutive school years. Then, in the beginning of the 2013-2014 school year, Mercedes asked another individual named Jose Duran, who is Hispanic, to take over the duties of morning scheduler.  (56.1 ¶ 19.)  Duran, the Parent Coordinator for the School, already had an early morning schedule and did not need to come into school early to perform the additional duties of morning scheduler.  Thus, the School did not need to pay him (and did not pay him) per session income.  (56.1 ¶ 21; ECF No. 76, Ex. E ("Mercedes Dep. Tr.") 54:3-15.)  Mercedes testified that the decision to assign the work to Duran was based on budget considerations.[4]  (Mercedes Dep. Tr. 54:3-15.)  Plaintiff perceived this as discriminatory and a pretext for discrimination because, according to her, the applicable Collective Bargaining Agreement did not permit Duran to perform the morning scheduler work and this work had to go to a teacher.  But the testimony and UFT contractual provisions Plaintiff cites do not support her interpretation.  (*See* 56.1 ¶ 21; Glass Decl. Ex. 4; Mercedes Dep. Tr. 54:1-12.)

---

[4] After Plaintiff retired, the School asked a younger, Hispanic employee, Guillermina Ceballos, to assume the morning scheduler position.  Ceballos receives per session compensation for the work.  (Mercedes Dep. Tr. 54:22-56:6; 56:21-57:3.)

Plaintiff also complains that Defendants interfered with her lunch period in the 2013-2014 school year.  At the beginning of the year, she was not provided a specified lunch period. (56.1 ¶ 22.)  When Plaintiff complained to Duran (the scheduler at the time), Duran suggested that Plaintiff take one of her free periods for lunch initially, but, after discussing with Principal Mercedes, issued Plaintiff a new schedule with a defined lunch period.  (56.1 ¶¶ 23, 25.)  The new schedule added three more teaching periods to Plaintiff's week, raising her load from 22 to 25 teaching periods, which Plaintiff perceived as harassment and/or retaliation for complaining about not having a set lunch period.  (56.1 ¶ 26.)  Mercedes testified that Plaintiff was contractually required to teach 25 periods and that she had only been able to teach 22 periods up to this point due to an administrative oversight.  (Mercedes Dep. Tr. 59:2-60:13.)  Plaintiff has offered no evidence to dispute that the collective bargaining agreement provided for teachers to teach up to 25 periods in a week.  Plaintiff maintained a 25-period schedule through her retirement.  (Mercedes Dep. Tr. 60:17-20.)

Within a month after receiving the busier schedule, Mercedes reassigned Plaintiff from morning bus duty to covering the homeroom class for Kesha Rios, a literacy teacher.  (56.1 ¶ 28.)  Plaintiff perceived this as a less desirable assignment than morning bus duty.  Although the record is not entirely clear as to why the School chose to assign Plaintiff to cover Rios's homeroom class, Mercedes did testify that teachers are obligated to select a non-instructional, non-teaching activity five times a week.  (Mercedes Dep. Tr. 62:9-22.)  A teacher's assignment is based on both the teacher's preference and the needs of the School.  (Mercedes Dep. Tr. 62:23-63:3; *see also* 56.1 ¶ 28.)

In or around December 2013 and January 2014, Plaintiff asserts that she participated in several staff meetings in which Mercedes stated that senior staff was "too expensive" and that he would reach out to the DOE to have those staff members terminated.  (SAC ¶ 15.)  Plaintiff asserts this is evidence of age animus against senior staff and that she felt she was being targeted for termination.  (*See* ECF No. 79 ("MOL in Opp'n") at 6.)  Mercedes maintains that he does not remember making any such statements.  (Mercedes Dep. Tr. 47:19-48:7.)  In further support of Plaintiff's theory that Mercedes wanted to push out older Black teachers, she asserts that a number of older and/or Black teachers were in fact asked to leave and/or left the School in the 2013-2014 school year, including a 64-year old Black general education teacher named Linda White, as well as Susan Carr-Lagomarsini, Myrna Kinkle, Darryl McKnight, and Juanita Murray.  (SAC ¶ 16.)  In contrast, Plaintiff asserts that Hispanic teachers received better treatment, providing as examples the fact that White's co-teacher, a Hispanic male, received positive ratings whereas White received negative ratings that led her to leave the school, and the fact that four other younger and/or Dominican teachers were not asked to leave the school even though they had received negative ratings.

In addition, Plaintiff complains that commencing in the 2013-2014 school year and continuing until June 2017, Mercedes denied her sufficient art supplies.  According to Plaintiff, she was not given a budget from the School.  (*See* ECF No. 76, Ex. C ("Harewood Dep. Tr.") 221:17-222:14; 225:4-20; 56.1 ¶ 83.)  Instead, Plaintiff contends that her only funds came through a grant to the School—the Arts Studio Funding Allocation.  This grant provided $1,000 in funding to schools for each active full-time, certified, and assigned secondary level teacher.  (Glass Decl. Ex. 20.)  There were other ways Plaintiff could get supplies as well.  The Teachers

Union also reimbursed Plaintiff for up to $125 in materials she purchased for her classes (a benefit offered to all teachers).  (56.1 ¶ 81.)  And, the DOE maintains a warehouse (which Plaintiff calls a creative reuse center), where Plaintiff could look for various materials for her classes.  (56.1 ¶ 82.)  Mercedes contends, and the parties appear to agree, that Plaintiff had a small budget and art supplies (56.1 ¶ 83,) although not at the level that Plaintiff felt she was entitled.  Mercedes also testified that certain other "Arts Matters" funding that Plaintiff sought was reserved for a part-time music teacher and a dance teacher vacancy and thus could not be allocated to Plaintiff.  (Glass Decl. Ex. 23; Mercedes Dep. Tr. 66:3-25.)  Plaintiff admits that the "Arts Matters" funding was properly directed to the music teacher instead of her.  (Harewood Dep. Tr. 223:12-20.)

   2.  <u>**2014-2015 School Year**</u>

       During the 2014-2015 school year, more problems arose.  For example, in past years Plaintiff received per session income for staying after school and helping students improve their art portfolios for their applications to specialized high schools.  (*See* Mercedes Dep. Tr. 67:13-19.)  Beginning in the 2014-2015 school year, Mercedes terminated this program on the grounds that it was too costly and reached too few students to warrant the expenditure.  (56.1 ¶ 87; Mercedes Dep. Tr. 68:12-69:7.)  This program was never formally reinstated, notwithstanding Plaintiff's requests in subsequent years and Plaintiff occasionally volunteering her time to help students with their portfolios after school.

       On January 15, 2015, Plaintiff received criticism about her "body language," and Mercedes expressed concern about how Plaintiff would fit into certain unspecified upcoming

School initiatives.  (56.1 ¶ 37.)  Based on the concerns Mercedes expressed, Plaintiff felt that

Mercedes wanted her to leave the School and/or resign.  (56.1 ¶ 38; Glass Decl. Ex. 8.)

In March 2015, Mercedes denied Plaintiff an opportunity to earn per session income

again.  Specifically, Plaintiff attended a workshop linked to a bookmaking competition for New

York City Schools with the goal of encouraging and assisting students at the School to

participate in the competition.  (56.1 ¶¶ 93-94; Harewood Dep. Tr. 185:17-24.)  Mercedes did

not recall ever authorizing the competition, and did not authorize per session income for

Plaintiff to help students prepare for it.  (Mercedes Dep Tr. 77:5-78:4.)  So, although she

attended the workshop, Plaintiff elected not to stay after work to assist students with the

competition because she would not be paid for her time.  (Harewood Dep. Tr. 187:11-16.)

In the Spring of 2015, Mercedes also began indicating a desire to eliminate Plaintiff's

classroom.  He first asked Plaintiff if she would be willing to co-locate the music and art

classrooms purportedly to find additional space for general classroom instruction.  (56.1 ¶ 59.)

The co-location idea was not adopted, however, and Mercedes formally eliminated the art

classroom in early June 2015.  The parties dispute the reason for the change:  Defendants say

the room was converted to a multipurpose room because the school needed storage space for

additional white boards and literacy materials, whereas Plaintiff contends the room was

changed into a 6th grade classroom.  (56.1 ¶¶ 50-51.)  Although Defendants say they eliminated

a science lab at the same time, Plaintiff disputes this and has presented an organization chart

showing that the room remained assigned to a science teacher.  (Glass Decl. Ex. 9.)  According

to Plaintiff, she believes her classroom was eliminated to push her out.  (56.1 ¶ 62.)  She also

claims that there were various vacant rooms that could have been used as an art classroom—a point that Defendants dispute.  (Mercedes Dep. Tr. 87:4-88:1.)

As further proof that Mercedes was targeting Black teachers, Plaintiff states that other Black teachers were asked to leave the school in early 2015 including Tiffany Mack and Elaine Blocker.  (Harewood Dep. Tr. 110:1-23.)  She contends that younger and/or Hispanic teachers who had poor performance ratings were retained, including Amanda Dreeban, Victor Vargas, Teodoro Thimodent, and Anna Bermudez.  (SAC ¶ 14.)  Mercedes testified that he evaluated all teachers fairly and that he also criticized the performance of four Hispanic teachers, asking them to look for another job outside of the School.[5]  (56.1 ¶ 48.)

**3.  2015-2016 School Year**

The elimination of a dedicated art classroom in June 2015 created burdens for Plaintiff in her last two years of employment, as she had to store her art supplies in various places and load them onto a cart to wheel into other teachers' classrooms.  (56.1 ¶¶ 53-54.)  It also interfered with Plaintiff's ability to conduct parent/teacher conferences, as she did not have a classroom.  Instead, she had to hold the conferences outside of the storage closet where she kept her students' portfolios.  (56.1 ¶ 55.)

On October 9, 2015, due to having to push an art cart around the school and certain physical limitations, Plaintiff requested an elevator key so she could use the School's elevator.  (56.1 ¶ 64.)  After about a month of discussions with the School and her union representative, the School custodian issued Plaintiff a key.  Plaintiff used the key until June 2017, at which point

---

[5] The timing of the departures is disputed, as one teacher appears to have left the school in the 2013-2014 school year.  (56.1 ¶ 49.)

Mercedes requested that all elevator keys be returned.  (56.1 ¶¶ 64-74.)  Plaintiff contends she was hassled about the key unnecessarily.[6]  (*See, e.g.*, Harewood Dep. Tr. 254:19-24.)

During this school year, Mercedes assigned Plaintiff to teach writing.  In one of her classes, a student wrote humiliating and degrading things about Plaintiff, which prompted Plaintiff to complain to Mercedes and the Guidance Counselor at the School.  However, to Plaintiff's knowledge, the student was not disciplined or removed.

Plaintiff also complains that Verona changed Plaintiff's lunch period for no reason other than to prevent her from being able to have the same period free as her colleagues, thereby forcing Plaintiff to eat alone in a closet, her car, the auditorium, or a stairwell because there was no cafeteria in the School and the School prevented her from using any classroom.  (Harewood Dep. Tr. 270:13-271:17; Glass Decl. Ex. 6.)  She also states she was prevented from using a room that Dominican staff members were permitted to use to refrigerate their lunch.  (Harewood Dep. Tr. 271:10-272:3.)

In February 2016, Lehman College in the Bronx, New York administered an after-school program called "GEAR-UP."  (56.1 ¶ 98.)  The program is designed to provide students with academic support, skills, and preparation to succeed in post-secondary education.  http://www.thebronxinstitute.org/gear-up.html (last visited Nov. 18, 2020).  Lehman College hired Plaintiff to work with the program, which provided her with additional per-session income.  (56.1 ¶ 101.)  Plaintiff enjoyed working at the program, but, as discussed below, did not continue with the program in the following school year.

---

[6] At the end of the 2016-2017 school year, Mercedes requested return of the key.  Plaintiff contends Mercedes had no intention of providing Plaintiff with a replacement if she returned the following school year.  (*See* Harewood Dep. Tr. 259:5-8.)

**4.** <u>2016-2017 School Year</u>

Plaintiff hoped to restart her work with the GEAR-UP program at the beginning of the 2016-2017 school year.  (Harewood Dep. Tr. 202:1-13.)  However, starting November 12, 2016, the GEAR-UP program schedule changed from weekdays to Saturdays.  (56.1 ¶ 104; Glass Decl. Ex. 27; Harewood Dep. Tr. 202:25-203:14.)  Lehman College took applications from individuals who wanted to work on Saturdays (Glass Decl. Ex. 27,) but Plaintiff did not inquire about an open position or apply to work for the program on Saturdays.  (Harewood Dep. Tr. 205:2-7; 213:10-20.)  According to Plaintiff, she was under the impression that all of the Saturday teaching positions were filled when the decision was made to change the schedule.  (Harewood Dep. Tr. 205:2-7.)  However, record evidence confirms that Plaintiff could have applied for a Saturday position with the program through the School.  (*See* Glass Decl. Ex. 27.)  Two other African-American teachers did apply for and were hired to work with the Saturday program.  (*See* 56.1 ¶ 105; ECF No. 73 at 5 ("MOL in Supp.").)

Plaintiff also complains that, in February 2017, she received a new schedule that required her to pick up students from the lunchroom every day whereas younger Hispanic teachers were not required to do so.  (SAC ¶ 42.)

The School administration also began criticizing Plaintiff for her performance and/or conduct in her final school year.  First, on March 2, 2017, Plaintiff was accused of pushing and spitting on a misbehaving student, who was using a water bottle to disrupt the class.  (Glass Decl. Ex. 33.)  Plaintiff apparently wrestled with the student to take away the water bottle and admitted that she pushed the student.  (Harewood Dep. Tr. 92:13-21.)  The record indicates that the student had cursed at Plaintiff and alleged that Plaintiff had spit on her.  (Harewood

Dep. Tr. 92:2-21.)  One other teacher who observed the incident reported that Plaintiff had only

pushed the student in self-defense.  (Glass Decl. Ex. 34.)  Nevertheless, after investigating the

incident, Mercedes found the student's allegation credible and issued Plaintiff a disciplinary

letter for corporal punishment.  (56.1 ¶¶ 141-42; ECF No. 76, Baskin Declaration, ("Baskin

Decl.") Ex. BB.)  This resulted in the first disciplinary letter Plaintiff had ever received in her

career.  (SAC ¶ 46.)

      After this incident, School administrators observed Plaintiff in the classroom to evaluate

her teaching/pedagogy.  (56.1 ¶ 109.)  First, on April 20, 2017, Assistant Principal Varona

informally observed Plaintiff's teaching and provided Plaintiff with an Informal Observation

Report on May 2, 2017.  (56.1 ¶¶ 110-11.)  Varona rated Plaintiff "Developing" – the second

lowest rating a teacher can receive – in six of the eight teaching skill categories assessed in the

evaluation.  (56.1 ¶ 115.)  The basis for the ratings included that "2/8 groups of students were

not given any assignment to do . . . [and] 7/27 students were seat[ed] at their desks in their

own conversations without an assignment to complete."  (56.1 ¶ 116.)

      When Plaintiff followed up with Varona for more detailed feedback, Varona merely

referred Plaintiff to the Danielson Framework Rubric – a teaching evaluation framework

designed to promote uniformity in teaching standards.  (*See* Baskin Decl. Ex. Z.)

      Then, on May 19, 2017, Principal Mercedes informally observed Plaintiff's teaching.

(56.1 ¶ 120.)  Mercedes rated Plaintiff "Ineffective" – the lowest rating a teacher can receive –

in five of the eight teaching skill categories assessed in the evaluation.[7]  (56.1 ¶ 121; Baskin

---

[7] These five categories included: (1) demonstrative knowledge of content and pedagogy; (2) designing coherent
instruction; (3) using questioning and discussion techniques; (4) engaging students in learning; and (5) using
assessment in instruction.

Decl. Ex. W.)  In his report, Mercedes wrote that he "observed students in groups working on what [he] was informed by students was a science project that needed to be completed. [He asked] 6 students to provide [him] with the rationale of working on the science project in Art class and students were unable to articulate a reason."  (56.1 ¶ 123.)

Plaintiff disputed (and disputes) Mercedes' assessment, explaining that the lesson was designed in collaboration with the School's science teacher and that, as a part of the lesson, students were tasked with crafting poster boards, pamphlets, or a powerpoint presentation with artistic elements about an alternative energy source of their choice.  (56.1 ¶¶ 124-28; Glass Decl. Ex. 32.)  Plaintiff testified that she was assisting a group of students with their posters when Mercedes began observing the class and questioning the students.  (Harewood Dep. Tr. 51:1-8.)  Plaintiff also notes that neither negative performance evaluation was consistent with her past evaluations—since 1999 she had always received ratings of at least "satisfactory" or "effective," and Mercedes had even rated Plaintiff "highly effective" in the past.  (Mercedes Dep. Tr. 28:25-29:4; 161:6-11.)

Plaintiff's salary was not impacted as a result of either rating; nor was she demoted or penalized in terms of benefits. (Harewood Dep. Tr. 84:22-85:7; 65:7-66:1.)  No mention was made of Plaintiff's race or age in connection with the evaluations.  (*Id.* at 66:2-7; 77:19-23.)

In May 2017, Mercedes requested that Plaintiff return the elevator key, which, by that point, she had been using for almost two full school years.  Without access to the elevator, Plaintiff says her physical condition worsened, and, due to that and stress, she took a leave of absence from May 28 to June 14, 2017.  (SAC ¶¶ 55, 57.)

Plaintiff was upset about the negative ratings and apparently discussed the negative feedback she had received from Verona with her class.  Afterwards, a few students from Plaintiff's class met with Verona and complained that Plaintiff was angry with them in light of the negative feedback she had received.  (Baskin Decl. Ex. CC; 56.1 ¶ 143.)  After investigating and discussing the matter with Plaintiff and her union representative, Mercedes issued another disciplinary letter to Plaintiff on June 28, 2017—this time for verbal abuse of students.  (56.1 ¶ 149; Baskin Decl. Ex. CC.)  In the letter, Mercedes credited the students' accusations against Plaintiff and determined that Plaintiff engaged in retaliatory, dangerous, and unacceptable behavior.  (Baskin Decl. Ex. CC.)  Further, Mercedes's letter warned Plaintiff that the School might pursue additional disciplinary action and that he was recommending that the DOE pursue 3020a charges against her.[8]  (Baskin Decl. Ex. CC.)  Plaintiff flatly denied (and denies) the students' allegations.  She testified that the only thing she told her class was that she did not have any "favorites" and that she did not want to be accused of playing favorites.  (Harewood Dep. Tr. 146:10-147:16.)

5. **Post-Retirement Incidents**

On July 1, 2017 Plaintiff formally retired.  (56.1 ¶ 154; Baskin Decl. Ex. B.)  She claims she was constructively discharged because of hostile treatment and that but-for such treatment she would have continued working at the School for several more years.  Plaintiff filed her charge with the SDHR and the EEOC just days after her retirement.  Approximately a year later, Principal Mercedes requested that Plaintiff come in to MS 390 to discuss outstanding

---

[8]  Tenured teachers may only be discharged for just cause pursuant to the 3020a process. http://www.nysed.gov/educator-integrity/teacher-tenure-hearings-3020a (last visited Nov. 18, 2020).

13

investigations into her misconduct toward students.  (Mercedes Dep. Tr. 146:19-25.)  Plaintiff

complains that Mercedes had previously represented that these disciplinary cases were closed

and that nothing further would be done.  Thus, Plaintiff argues that Defendants required her to

return to the School to discuss these false allegations in retaliation for her having filed a charge

with the SDHR and the EEOC.

## SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court may grant summary

judgment when "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the burden of

demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the

court must be able to find 'after drawing all reasonable inferences in favor of a non-movant'

that 'no reasonable trier of fact could find in favor of that party.'"  *Palmer/Kane LLC v. Rosen

Book Works LLC*, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016) (internal citation omitted) (first citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); then quoting *Heublein, Inc. v. United

States*, 996 F.2d 1455, 1461 (2d Cir. 1993)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986) (explaining that the moving party is entitled to summary judgment where the

"nonmoving party has failed to make a sufficient showing on an essential element of her case

with respect to which she has the burden of proof").  "In evaluating whether the parties have

met their respective burdens, this Court 'examine[s] the record as a whole, just as a jury would,

to determine whether a jury could reasonably find an invidious discriminatory purpose on the

part of an employer.'"  *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 254 (S.D.N.Y. 2009) (alteration

in original) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001),

superseded on other grounds by Fed. R. Civ. P. 37(e)).

To receive consideration, evidence submitted in support of or in opposition to a motion

for summary judgment must be admissible at trial.  *See Santos v. Murdock*, 243 F.3d 681, 683

(2d Cir. 2001) ("[a]ffidavits submitted to defeat summary judgment must be admissible

themselves or must contain evidence that will be presented in an admissible form at trial."

(citing *Celotex Corp.*, 477 U.S. at 323–24); *see also Burlington Coat Factory Warehouse Corp. v.

Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (plaintiff could not rely on inadmissible hearsay

to oppose motion for summary judgment); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650,

675 (S.D.N.Y. 2012) (comment made to plaintiff by non-party that the non-party and plaintiff's

employer "did not like blacks" was inadmissible hearsay).  A non-moving party cannot create a

material issue of fact to defeat summary judgment by making conclusory statements that are

unsupported by admissible evidence.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

When determining whether a grant of summary judgment is appropriate, the court's

decision should not hinge on whether it "'believes that the plaintiff will be unable to meet his

or her burden of persuasion at trial.'"  *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483,

493 (S.D.N.Y. 2010) (alteration in original) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54

(2d Cir. 1998)).  Instead, the court must determine whether there is such a "'lack of evidence in

support of the plaintiff's position" or evidence that is "'so overwhelmingly tilted in one

direction that any contrary finding would constitute clear error.'"  *Id.*  It is well settled that

"[c]redibility assessments, choices between conflicting versions of the events, and the weighing

of evidence are matters for the jury, not for the court on a motion for summary judgment."

*Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (alteration in original) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55–56 (2d Cir. 1997)).

In the context of employment discrimination lawsuits, courts must be "especially cautious" in granting summary judgment "because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (first citing *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); then citing *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994)), abrogated on other grounds as recognized by *Burniche v. General Elec. Automation Servs., Inc.*, 306 F. Supp. 2d 233, 241 (N.D.N.Y. 2004).

## DISCUSSION

### 1. Title VII and ADEA Claims

#### A. Statute of Limitations

Prior to asserting claims under Title VII or the ADEA in federal court, a plaintiff must "present the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency." *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (per curiam)); *see also Tanvir v. N.Y.C. Health & Hosps. Corp.*, 480 Fed. App. 620, 621 (2d Cir. 2012). Both Title VII and the ADEA require that a plaintiff first file a charge with the EEOC within 300 days of the alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("A party . . . must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."); *Palak v. St. Francis Hosp.*, No. 14-cv-4383, 2015 WL 3682805, at *10 (E.D.N.Y. 2015) ("each incident of discrimination and each retaliatory adverse

employment decision constitutes a separate actionable unlawful employment practice" which will be time-barred if not brought within the applicable 300-day period) (citations omitted).

Here, Plaintiff filed a complaint with the State Division of Human Rights (which was dual filed with the U.S. Equal Employment Opportunity Commission) on July 11, 2017.  Thus, claims arising from alleged discriminatory acts occurring prior to September 14, 2016 (*i.e.*, 300 days before that charge was filed) are time-barred.   Accordingly, the Court assesses only whether the alleged discriminatory conduct that occurred during the 2016-2017 school year gives rise to liability for disparate treatment.

Nevertheless, alleged discrimination that occurred in prior school years provides relevant background evidence to Plaintiff's timely claims.  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (noting that, "even with respect to a claim of discrete discriminatory or retaliatory acts, expiration of limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim'") (quoting *Morgan*, 536 U.S. at 113).  Additionally, to the extent Plaintiff alleges a hostile work environment, such a claim may be timely under a continuing violation theory.  Under this theory, a plaintiff may recover for acts occurring more than 300 days before the charge was filed with the EEOC, or the equivalent state agency, so long as the acts were part of the same hostile work environment and at least one such act occurred within the 300-day period. *Morgan*, 536 U.S. at 116-17.  Discrete employment actions that are independently actionable, however, cannot be used to support a continuing violation theory.  *See id.* at 122; *see also Sotomayor*, 862 F. Supp. 2d at 250.

17

Here, plaintiff alleges there was a racially hostile and ageist work environment that commenced in the 2013-2014 school year and continued through the 2016-2017 school year, culminating in her constructive discharge/retirement in July 2017.  Therefore, the Court assesses whether Plaintiff states a claim of harassment that would satisfy the continuing violation standard below.  First, however, the Court will assess Plaintiff's disparate treatment claims under Title VII and the ADEA.

### B.  Disparate Treatment – Race and Age Discrimination

Employment discrimination claims under Title VII and the ADEA are analyzed under a three-step burden shifting paradigm first articulated in *McDonnell Douglas v. Green*.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Under this framework, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) if the employee does so, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *See McDonnell Douglas Corp.*, 411 U.S. at 802.  If the employer satisfies its burden, the plaintiff must then show that the reasons presented were a pretext for impermissible motivation.  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107-08 (2d Cir. 2019).  Under Title VII, the plaintiff asserting race discrimination must demonstrate that race was a motivating factor for the adverse employment action.  Under the ADEA, the plaintiff must demonstrate that age was the but-for cause of the adverse action.  *Brenner v. City of New York Dep't of Educ.*, 659 Fed. App. 52, 53-54 (2016); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105–06 (2d Cir. 2010).

On summary judgment, the district court's "determination of whether the circumstances 'giv[e] rise to an inference' of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a

rational finder of fact to infer a discriminatory motive." *Bryant v. Verizon Commc'ns, Inc.,* 550 F.

Supp. 2d 513, 534 (S.D.N.Y. 2008).  Conclusory allegations devoid of specifics are insufficient to

defeat summary judgment.  *Walsh v. Scarsdale Union Free School Dist*., 375 F. Supp. 3d 467

(S.D.N.Y. 2019); *see also Wade v. New York City Dept. of Educ.*, No. 11-cv-5278 (LGS), 2014 WL

941754 (S.D.N.Y. Mar. 10, 2014) (granting motion for summary judgment; teacher could point

to no concrete facts that male teachers were treated better or that her race motivated

termination).

The DOE argues that Plaintiff fails to state a prima facie case of race and age

discrimination.  Establishing a prima facie case entails showing that the plaintiff is (1) in the

protected group, (2) was qualified for the position and/or satisfied the employer's legitimate

job expectations, (3) suffered an adverse employment action and that (4) the adverse

employment action occurred under circumstances giving rise to an inference of discrimination.

*Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 297 (S.D.N.Y. 2009).  There is no dispute

that Plaintiff satisfies the first two prongs of her prima facie case.  Instead, Defendants argue

that Plaintiff cannot satisfy the third and fourth prongs.

Starting with the third prong, the Court must consider whether any of the School's

actions since September 14, 2016 (that is, within the statute of limitations period) constituted

an adverse employment action within the meaning of Title VII and the ADEA.  The Second

Circuit has held that an employer's action must result in a "materially adverse change" to a

plaintiff's terms and conditions of employment to be an actionable adverse action under these

statutes.  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Sanders v.*

*New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citing *Richardson v. New*

*York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)).  "Examples of materially

adverse changes include termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, significantly diminished

material responsibilities, or other indices unique to a particular situation."  *Vega v. Hempstead

Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (internal citation omitted).  A change in

working conditions must be "more disruptive than a mere inconvenience or an alteration in job

responsibilities" to be actionable.  *Galabya*, 202 F.3d at 640 (citing *Crady v. Liberty Nat'l Bank

and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  In the context of claims by teachers against a

school, courts have recognized that a negative performance evaluation, more frequent

observations, letters to the file, a heavier teaching load, and other conduct that does not trigger

an adverse job consequence, such as a loss of pay, are not adverse employment actions.  *See,

e.g.*, *Sotomayor*, 862 F. Supp. 2d at 255-56 (more frequent observations, negative reviews,

letters to the file, giving less preferred teaching assignment, assignment of a heavier teaching

load, more undesirable classroom assignment, and not being given a dedicated classroom not

adverse employment actions).

Some of the conduct that Plaintiff points to could constitute an adverse employment

action whereas some cannot.  Possible adverse employment actions are the denial of per

session income, negative performance reviews, and discipline that occurred in Plaintiff's final

school-year.  However, the Court must ascertain whether there is evidence that the School in

fact took these alleged actions and whether they resulted in a loss of tangible employment

benefits.

First, Plaintiff claims that she suffered an adverse action when she was removed from the GEAR-UP program in November 2016.  (MOL in Opp'n at 22.)  Plaintiff had worked in this program in the 2015-2016 academic year, and therefore asserts that she was entitled to continue working for GEAR-UP and to receive per-session income for her work in the following year.  (MOL in Opp'n at 22.)  She complains both that the program was changed from weekdays to Saturdays and that she was not allowed to continue working.  Yet, Plaintiff concedes that Lehman College, not the School, hired her to work in the GEAR-UP program.  (56.1 ¶ 101.)  There also is no evidence that the School initiated the program being changed from weekdays to Saturdays.  Rather, the evidence submitted to the Court suggests that Lehman College made the decision.  (Glass Decl. Ex. 27.)  The evidence also shows that Plaintiff received an email attaching an application form to apply to work for the program on Saturdays and another email indicating that the program was looking for prospective teachers.  (Glass Decl. Ex. 27; Baskin Decl. Exs. P, Q.)  Plaintiff, however, concedes she did not apply to work as part of the Saturday program.  (Harewood Dep. Tr. 204:24-205:5; *see also* 56.1 ¶ 107.)  Even making all reasonable inferences in favor of Plaintiff, the evidence does not support a finding that the School was responsible for denying Plaintiff work at the GEAR-UP program. *See Sotomayor*, 862 F. Supp. 2d at 256 (no adverse employment action where the plaintiff did not apply for the per-session position at issue).  Thus, this alleged loss of per session income does not constitute an adverse action.

In contrast, Plaintiff testified that in the 2014-2015 and 2015-2016 school years she requested that the School reinstate her after school art portfolio program. (Harewood Dep. Tr. 181:5-20.)  In prior years Plaintiff had received per-session work and pay for helping students

21

develop portfolios for applying to specialized high schools.  (Mercedes Dep. Tr. 67:17-19; 56.1 ¶ 87; Harewood Dep. Tr. 180:21-181:4.)  Plaintiff could not recall whether she asked that the program be reinstated in the 2016-2017 academic year, but testified that she assisted students after school in that year and did not receive any per-session income for that work.  (Harewood Dep. Tr. 181:21-24.)  For purposes of this motion, the Court assumes that this constitutes an adverse employment action because Plaintiff did help students after school and a jury could find that she repeated her request to be paid for her time given her past requests. *See Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (holding that preventing the plaintiff from earning overtime and comp time may constitute an adverse action under the law).

Next Plaintiff points to two disciplinary letters issued against her in late 2017, one for pushing a student and another for verbal abuse.  After the first incident, Plaintiff met with Mercedes and her union representative to discuss what transpired.  Mercedes told Plaintiff that he would issue a disciplinary letter to her personnel file but that nothing else was going to happen to her.  (Harewood Dep. Tr. 95:15-20; 96:11-22.)  Plaintiff also was required to attend a hearing concerning the first incident.  Plaintiff testified that she was cleared of all charges, and that the student she was accused of pushing was suspended from school for 30 days. (Harewood Dep. Tr. 97:2-98:8.)  Plaintiff also testified that the letter to file related to this incident did not lead to any material loss of benefits (Harewood Dep. Tr. 99:21-100:17,) although the letter did include language that threatened further disciplinary action, up to and including termination.  (Glass Decl. Ex. 33.)

Similarly, Plaintiff met with Mercedes and her union representative concerning the separate allegation of verbal abuse.  Although Plaintiff vehemently denied that any verbal

abuse took place, she did not formally challenge the accusations because the letter to file was issued after she had announced her retirement, just days before she formally retired. (Harewood Dep. Tr. 149:16-150:4.)  The letter recommended that the DOE pursue 3020a charges against Plaintiff.  (Glass Decl. Ex. 51.)  Plaintiff testified that her terms and conditions of employment were not altered as a result of this letter to file, although she maintains that both letters were abusive and generally contributed to her decision to retire early.  (Harewood Dep. Tr. 155:17-157:7.)  Because both of these letters threatened additional disciplinary action and both investigations into her alleged misconduct could have reasonably contributed to Plaintiff's decision to retire early, the Court will treat them as adverse employment actions for purposes of this motion.[9]

Other actions taken by the School in the 2016-2017 school year, however, do not constitute adverse employment actions under the law.  With respect to the two negative performance evaluations stemming from Varona's and Mercedes's informal observations of Plaintiff's teaching, Plaintiff concedes they did not negatively impact her salary, position, or benefits.  (Harewood Dep. Tr. 84:22-85:7.)  Thus, they do not constitute adverse employment actions.  *See Smith v. City of New York*, 385 F. Supp. 3d 323, 334 (S.D.N.Y. 2019) ("[n]egative evaluations, standing alone without any accompanying adverse results, are not cognizable under the anti-discrimination laws") (internal quotations and citations omitted).

---

[9] Although Plaintiff broadly asserts that Defendants disciplined her even after she left the School, the record reveals that Mercedes was required to follow up with Plaintiff, even after her retirement, in order to close the open investigation into these allegations.  (Mercedes Dep. Tr. 144:9-17; 146:19-25.)  In other words, there was no new discipline issued.

Similarly, Defendants' alleged refusal to allocate funding for art supplies is not an adverse action.  There is no dispute that Plaintiff did receive some funds and art supplies; they just were not at the level Plaintiff contends she needed or desired.  (56.1 ¶¶ 83-84; Harewood Dep. Tr. 216:21-217:17; 219:18-19.)  While the Court is sympathetic to the limited funding available to art teachers in New York City public schools, these circumstances are not akin to other materially adverse employment actions ordinarily entertained by Courts in this Circuit such as a termination, demotion, or a material loss of benefits.  Additionally, Mercedes's request that Plaintiff return her elevator key to the administration, despite her back pain, was not a materially adverse action, as the evidence shows that all teachers at the School were asked to return their keys so that the keys could be updated.  (56.1 ¶ 74; Mercedes Dep. Tr. 190:2-8.)

While Plaintiff complains that Mercedes removed Plaintiff from her classroom, which forced Plaintiff to work without her own art room, the evidence shows that Mercedes took similar actions towards other teachers at the School in light of abatement efforts and/or construction.  (*See* Mercedes Dep. Tr. 87:4-88:1.)  Mercedes testified that the MS 390 technology room, social studies room, and science room were also vacated by their respective teachers (*Id.* at 99:17-100:13,) and Plaintiff failed to meaningfully rebut this testimony.  In any event, a room reassignment does not constitute an adverse employment action under the law unless Plaintiff can show that the reassignment prevented her from performing her job responsibilities.  *Gordon v. New York City Bd. of Educ.*, No. 1-cv-9265 (SAS), 2003 WL 169800, at *7 (S.D.N.Y. Jan. 23, 2003) (holding that a teacher's lack of a personal classroom, while inconvenient, was not an adverse employment action absent evidence showing an inability to

perform her job).  In this case, no reasonable fact-finder could determine that Plaintiff was

unable to perform her job without her own classroom.  As mentioned above, the record

indicates that Plaintiff was able to make the best of these circumstances through elevator

access and an art supply cart.

Plaintiff also asserts that her lunch period was inexplicably rescheduled in her last year

of employment so that it would not align with her middle school colleagues' lunch period.

(Harewood Dep. Tr. 270:13-271:3.)  Plaintiff testified that she was barred entry into other

classrooms during her new lunch period and that, as a result, she was forced to eat lunch in the

stairwell, in her car, or in other inconvenient and uncomfortable locations through the 2016-

2017 academic year.  (*Id.* at 271:3-17.)  While certainly inconvenient, none of these

circumstances constitute actionable adverse employment actions.  *See Kaur v. New York City

Health and Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) (holding denial of vacation

time and alteration of plaintiff's lunch schedule did not rise to the level of an adverse

employment action); *see also White v. New York City Dep't of Educ.*, No. 12-cv-1376, 2014 WL

1273770 (SDNY Mar. 28, 2014) (granting summary judgment; change in job assignments were

not adverse employment actions because no evidence they were less prestigious or less suited

to plaintiff's skills); *Self v. Dept of Educ. of City of New York*, 844 F. Supp. 2d 428 (S.D.N.Y. 2012)

(granting summary judgment against teacher who claimed race and age discrimination;

complaints about being allowed less time to grade an exam than another teacher, being

assigned a less desirable class, and not being asked to go on a trip were not adverse

employment actions).

Assuming, however, that the denial of per session income for the after-school art portfolio program and the disciplinary letters were adverse employment actions, the Court next assesses whether Plaintiff has proffered evidence that these actions occurred under circumstances giving rise to an inference of race or age discrimination.  At the prima facie stage of the analysis, this burden is de minimis.  *Berube v. Great Atlantic & Pacific Tea Co.*, 348 Fed. App. 684, 686 (2d Cir. 2009) (summary order).  To satisfy this burden, Plaintiff provides the names of multiple younger and/or Hispanic teachers at the School who were offered extensive per session income opportunities and were consistently rated positively compared to their non-Hispanic counterparts.  Further, Plaintiff asserts that the School administration favored these teachers at every turn.  For the purposes of this motion, the Court will assume that these allegations are sufficient to give rise to an inference of discrimination under the *McDonnell Douglas* framework.

In response, the DOE has articulated legitimate reasons for all of these actions.  First, with respect to ending the after-school art portfolio program, Mercedes testified that he chose to terminate the program because it was too costly and reached too few students to warrant the money.  (56.1 ¶ 87; Mercedes Dep. Tr. 68:12-69:7.)  Mercedes explained that typical after-school programs involve a student-teacher ratio of at least 12 to 1 (Mercedes Dep. Tr. 68:12-19,) whereas only five or six students were involved in Plaintiff's portfolio development project.  (Harewood Dep. Tr. 181:5-24.)  Plaintiff confirmed that Mercedes informed her that there was "no money" in the school's budget to fund a smaller after-school program.  (Harewood Dep. Tr. 181:5-13.)  These budgetary constraints are legitimate, nondiscriminatory business reasons for otherwise adverse employment actions.  *See Shan v. New York City Dep't of Health and Mental*

*Hygiene*, No. 5-cv-3245 (TPG), 2007 WL 2746891, at *5 (S.D.N.Y. Sept. 19, 2007) ("[b]udget-driven reductions in force are, of course, legitimate, nondiscriminatory business rationales for discharge"); *Konteye v. New York City Dep't of Educ.*, No. 17-cv-2876, 2019 WL 4418647, at *13 (S.D.N.Y. April 10, 2019) (holding the New York City DOE budget reductions for the 2015-2016 academic year to be a legitimate, non-discriminatory basis to excess the plaintiff); *MacKinnon v. City of New York Human Res. Admin.*, 441 Fed. App. 16, 17 (2d Cir. 2011) ("[a]n employment decision motivated by pension costs, even when strongly correlated with age, is not an ADEA violation").

Likewise, the School provided legitimate reasons for the disciplinary letters.  The record reveals that the discipline was issued after investigations into allegations of misconduct.  For both incidents, Mercedes met with Plaintiff and her union representative and afforded her an opportunity to respond to the allegations against her.  Mercedes concluded that the claims against Plaintiff were credible based on his investigations and clearly articulated the basis for his findings in each letter.  (*See* Glass Decl. Exs. 33, 51.)  Accordingly, Defendants had a legitimate, non-discriminatory justification for issuing the disciplinary letters to Plaintiff's personnel file and to threaten additional disciplinary action.  *Simon v. New York City Bd. of Educ.*, No. 1-cv-6024 (DGT)(LB), 2006 WL 1210959, at *9 (E.D.N.Y. May 2, 2006) (finding a legitimate, non-discriminatory rationale where defendants provided detailed records explaining their reasons for issuing letters to plaintiff's file, including documented verbal abuse towards students and unsatisfactory job performance, among others).

Because Defendants have met their burden of production, Plaintiff must proffer sufficient admissible evidence that would permit a reasonable factfinder to infer, based on a

preponderance of the evidence, that Defendants' actions were a pretext for discrimination. *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 540-41 (S.D.N.Y. 2007). Plaintiff must do more than merely dispute the accuracy of the nondiscriminatory justification proffered by Defendants to meet this burden.

Here, with respect to denial of per session income, Plaintiff does not argue that Defendants' proffered justification of budgetary constraints is fabricated or exaggerated. To the contrary, the record evidence demonstrates the School had a limited budget. (*See, e.g.*, Harewood Dep. Tr. 231:18-23; Mercedes Dep. Tr. 50:5-20; 242:4-17; 243:23-244:3; 56.1 ¶ 94.) Instead, Plaintiff attempts to prove that Defendants' decision to terminate the after-school art portfolio program was motivated by discriminatory animus by claiming that Defendants offered other younger and/or Hispanic teachers per session opportunities.[10]

While it is true that giving younger and/or non-Black teachers more opportunities for per session income could demonstrate pretext, Plaintiff must demonstrate that those other teachers were similarly situated to her. "The law is well settled that a comparator employee must be situated similarly to the plaintiff in every material way before discrimination can be inferred on the basis of differential treatment." *White*, 2014 WL 1273770, at *15. Plaintiff has failed to make such a showing. There is absolutely no evidence that younger and/or Hispanic teachers were permitted per session opportunities for programs with a limited student to teacher ratio similar to Plaintiff's former portfolio program. The only evidence is to the

---

[10] Plaintiff attempts to make this showing, in part, by citing to a print out from "SEE THROUGH NY" (a private website that apparently provides New York State teacher salary information), which contains per session salary information for various Hispanic staff members at MS 390. This document is inadmissible hearsay to the extent it is offered to show that these teachers in fact earned that per-session income. *See FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 302 (S.D.N.Y. 2008).

contrary – that per session income was allocated to programs that reached a maximum number of students.  Further, to the extent Plaintiff has tried to point to salary information showing that a few Hispanic and/or younger colleagues earned per session income does not provide any statistical support for an inference of discrimination absent additional evidence; the numbers are too small and they do not provide insight into the circumstances of the various per session programs.  *See Baron v. New York City Dep't of Educ.*, No. 06-cv-2816 (FB)(MDG), 2009 WL 1938975, at *6 (E.D.N .Y. July 7, 2009) (holding that statistics alone are insufficient in a disparate treatment case because the plaintiff must prove that he/she *in particular* was discriminated against); *Self*, 844 F. Supp. 2d at 437 (holding sample size of eight to ten black teachers that were allegedly mistreated statistically insignificant and insufficient to prove pretext of race discrimination).

Plaintiff likewise offers no evidence indicating that the disciplinary letters issued against her were pretext for race or age discrimination.  Although Plaintiff generally argues that the allegations contained in the letters were false, she presents limited evidence to undermine the findings of the investigations.  Moreover, the record is devoid of any evidence demonstrating that the adverse letters were issued for a discriminatory reason; rather, students complained about Plaintiff's conduct, which led to investigations and disciplinary letters.  Nothing about the circumstances indicates that the investigations were initiated for a discriminatory purpose or that the conclusions of the investigations, even if disputed by Plaintiff, were motivated by racial animus or because of Plaintiff's age.  *Cf. Simon*, 2006 WL 1210959, at *9 ("Plaintiff . . . argues that some of the written complaints against him were false. However, in the face of defendant's

29

detailed record, plaintiff again presents no evidentiary materials to support his claim . . . bare

denials of the incidents . . . are insufficient to defeat summary judgment”).

To the extent Plaintiff asserts that younger and/or non-Black and Hispanic teachers

were not terminated or threatened with termination through discipline, her allegations are

conclusory.  There is no evidence that any of these other teachers were similarly situated to

Plaintiff.  Likewise, Mercedes's comments that the senior teachers were expensive and/or that

he wanted to rid the school of more expensive teachers, even if true, are insufficient to infer

that the actionable conduct about which Plaintiff complains (*i.e.*, the loss of per session income

for the art portfolio program and the discipline) was discriminatory, or was caused, in part, by

Plaintiff's age.  *See Wade*, 2014 WL 941754, at *10 (clarifying, with case law, that terminating

an employee for a replacement with a lower salary is not a basis on which to establish an ADEA

claim).

In light of the above, no rational juror could find that Plaintiff was discriminated against

on the basis of race or age.  Accordingly, I recommend that Defendant's motion be granted and

that Plaintiff's Title VII and ADEA disparate treatment claims be dismissed.

### C.  Hostile Work Environment

Hostile work environment claims are analyzed in the same way under Title VII and the

ADEA.  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).  To establish a hostile work

environment claim under both statutes, a plaintiff must “show that the complained of

conduct: (1) is objectively severe or pervasive—that is, creates an environment that a

reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff

subjectively perceives as hostile or abusive; and (3) creates such an environment because of the

plaintiff's [race, national origin, or age]." *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007); *see also, e.g., Harris v. Forklift Sys., Inc., Inc.,* 510 U.S. 17, 21 (1993); *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002).

In determining whether the conduct was sufficiently severe or pervasive, courts look at "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Aulicino v. N.Y.C. Dep't of Homeless Servs.,* 580 F.3d 73, 82 (2d Cir. 2009) (internal citations and quotations omitted).  As a general rule, to constitute a hostile work environment, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano,* 294 F.3d at 374 (internal citations and quotations omitted).  And again, in the context of summary judgment, the plaintiff must provide admissible evidence from which a reasonable juror could conclude that the hostile conduct occurred because of a protected characteristic, such as race or age.  *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).  If no reasonable juror could so conclude, then summary judgment is appropriate.

Plaintiff alleges a number of acts over the course of an approximately four-year period to support her hostile environment claim.  They include:

- Taking away the morning scheduler per session work in the 2013-2014 school year;
- Not providing her a specific lunch period for the first month of the 2013-2014 school year;
- Changing her schedule to add three more teaching periods, bringing her to the contractual maximum of 25 teaching periods in the 2013-2014 school year and all years thereafter;
- Reassigning Plaintiff from morning bus duty to covering a homeroom class in the 2013-2014 school year;

- Making comments in January 2014 that senior staff was "too expensive" and desiring that they be terminated;
- Providing insufficient funding and art supplies from 2013 through Plaintiff's final school year;
- Ending the after-school art portfolio program in the 2014-2015 school year and not reinstating it in subsequent school years;
- In January 2015, criticizing Plaintiff's "body language" and expressing concern about how Plaintiff would fit into certain unspecified upcoming School initiatives;
- In March 2015, refusing to afford per session income to Plaintiff for a bookmaking program and competition;
- In June 2015, eliminating Plaintiff's dedicated art classroom, thus requiring Plaintiff to store art supplies herself, transport them to classes on a cart, and meet with parents during parent-teacher conferences in a non-classroom setting at the School;
- At the beginning of the 2015-2016 school year, giving Plaintiff a hard time before consenting to allow her to have an elevator key;
- Refusing to discipline or remove a student who wrote humiliating and degrading things about Plaintiff in a writing assignment in the 2015-2016 school year;
- Changing Plaintiff's lunch period in the 2015-2016 school year to prevent her from having the same period as her friends and prohibiting her from using a designated room for lunch;
- In February 2017, changing her schedule and requiring her to pick up students from the lunchroom every day;
- In the Spring of 2017, issuing allegedly bogus discipline after an investigation for pushing a student;
- In the Spring of 2017, conducting two informal observations of Plaintiff's teaching and giving her less than effective ratings;
- Failing to provide adequate feedback for the less than effective ratings;
- Improperly characterizing her inquiries about the less than effective ratings as hostile; and
- Issuing allegedly bogus discipline after an investigation for verbally abusing or intimidating students that threatened potential further action and/or 3020a charges.

To start, there is no evidence that School administrators made racially discriminatory or ageist remarks to or about Plaintiff or otherwise. To the extent Plaintiff pleads that Mercedes complained that senior staff was "too expensive" and that he would reach out to the DOE to obtain assistance in removing those faculty members from the School, this alone is insufficient to demonstrate age animus. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-12 (1993)

(holding that, under the ADEA, a company decision to fire an older employee because their pension benefits were closer to vesting was not discriminatory because the decision "would not be the result of an inaccurate and denigrating generalization about age, but would rather represent an *accurate* judgment about the employee") (emphasis in original); *Wade*, 2014 WL 941754, at *10 ("[t]erminating an employee for one with a lower salary in and of itself is not a basis on which to establish an age discrimination claim, even if age and salary are largely related"). Moreover, Plaintiff does not provide any sworn testimony that Mercedes made such comments. She merely cites to her own Complaint to support this assertion. This is insufficient to avoid summary judgment. *See Fitzgerald v. Henderson*, 251 F.3d 345, 360-61 (2d Cir. 2001) (determining that a party may not properly oppose summary judgment based on the allegations contained in its pleading, unless the pleading is verified under oath). Accordingly, it cannot contribute to a hostile work environment claim. Other alleged comments, such as the one criticizing Plaintiff's "body language" are too vague to infer that they relate to Plaintiff's race or age. *See Jones v. Bloomingdale's*, No. 17-cv-1974 (RA), 2018 WL 6067227, at *5 (S.D.N.Y. Nov. 20, 2018) (holding that a description of an employee as having "hostile body language," was insufficient to support a discrimination claim absent additional evidence to show that this description was racially motivated).

Second, the various acts about which Plaintiff complains such as changes to her lunch period, non-approval of the book-making program, and hassling her about the elevator key, are episodic and not the type of conduct that courts find create severe or pervasive hostile work environments. Even the two negative performance reviews and two discipline letters in her last year are not sufficiently severe or pervasive to give rise to a hostile work environment claim as

a matter of law.  *See Littlejohn*, 795 F.3d at 321 (dismissing a hostile work environment claim

predicated, in part, on Defendant's negative and sarcastic statements towards the plaintiff,

replacing the plaintiff at meetings, wrongfully reprimanding plaintiff, and increasing the

plaintiff's workload); *see also Brenner*, 659 Fed. App. 52 (affirming grant of summary judgment;

handful of negative comments about older, white Jewish teachers and reassignment to a

"closet" instead of dedicated classroom did not constitute a hostile work environment); *Self*,

844 F. Supp. 2d 428 (granting summary judgment against teacher who claimed race and age

discrimination; stating in dicta that complaints about being allowed less time to grade an exam

than another teacher, being assigned a less desirable class, not being asked to go on a trip, and

pursuit of allegedly bogus disciplinary charge based on student complaints of verbal abuse and

corporal punishment insufficient to establish hostile work environment); *Sotomayor*, 862 F.

Supp. 2d 226  (summary judgment granted; increasingly frequent classroom observation,

negative performance evaluations and adverse letters to her file, frequent changes to room

assignments, and assignment of more difficult students were too episodic and not severe

enough to make out a hostile work environment).

   Third, and most importantly, there is insufficient evidence from which a rational juror

could find that any of the conduct was motivated by race or age animus.  For example, Plaintiff

complains that she was denied elevator access at the School while at least four other Hispanic

teachers were permitted to have their own elevator keys during the 2015-2016 and 2016-2017

school years.  (Harewood Dep. Tr. 254:12-257:11.)  However, the record reveals that Plaintiff

was given an elevator key, just as other employees were, and that when Mercedes requested

Plaintiff return her key, he similarly made that request to others.  (56.1 ¶¶ 73-74.)  The

evidence also shows that other teachers, not just Plaintiff, had to make do without a dedicated classroom or a shared space.  (*See* Mercedes Dep. Tr. 87:4-88:1, 99:17-100:13.)  Even if this were not the case, although it was inconvenient not to have a dedicated art classroom, the evidence does not show that the room was eliminated because of Plaintiff's age or race.  *White v. New York City Dep't of Educ.*, 2008 WL 4507614, at *6 (E.D.N.Y. Sept. 30, 2008) (granting summary judgment on hostile work environment claim, in part, because the failure to provide the plaintiff special education teacher with her own classroom was not racially motivated and was similarly applied to other teachers in the school).

Plaintiff also fails to provide evidence that any decisions or conduct concerning Plaintiff's lunch periods or lunch space were motivated by race or age animus.  Rather, she provides only speculation.  That a few other unspecified Dominican teachers utilized a refrigerator that she was not allowed to use, even if true, does not indicate harassment based on race.  And, while Plaintiff may have felt slighted, this is not the type of severe or pervasive conduct necessary to constitute a hostile work environment under Title VII or the ADEA.  *See Kaur*, 688 F. Supp. 2d at 332, 338 (finding, in part, that denial of plaintiff's vacation time, alteration of Plaintiff's lunch schedule, and four instances where plaintiff's food was thrown out did not create an objectively hostile work environment and was not based on a protected characteristic).  The same is true with respect to Plaintiff's complaints about the insufficient funds for art materials.

To be sure, Plaintiff was understandably upset when a student wrote degrading things about her in a writing assignment and was not disciplined.  (*See* Harewood Dep. Tr. 265:6-17.)  But, she fails to offer any evidence that the student was motivated by race or age animus or

that the School's actions vis-à-vis the student were similarly motivated.  See *Das v. Consol. Sch. Dist. of New Britain*, 369 Fed. App. 186, 190 (2d Cir. 2010) (summary order) (finding no hostile work environment as a result of (1) multiple student-on-teacher incidents of harassment over the course of three years, (2) where the plaintiff failed to proffer evidence to show that the student's behavior was racially motivated, and (3) where the plaintiff stated that she was unaware if the school followed up with disciplinary measures against the student).

There is likewise no evidence that the negative performance evaluations were motivated by age or race animus.  While it is sometimes the case that negative performance evaluations at the end of a long career with satisfactory performance can contribute to an inference of discrimination when there is other evidence of disparate treatment in the performance evaluations or evidence that undercuts the credibility of the evaluations, here there is no such evidence.  Also, Mercedes testified that he rated younger and Hispanic teachers negatively.  (*See* Mercedes Dep. Tr. 238:19-239:6; 56.1 ¶¶ 47-48.)  Moreover, the record is devoid of evidence demonstrating that the two discipline letters were motivated by race or age animus, as discussed above.

Finally, while there is no dispute that Plaintiff did not receive per session income for certain programs, there is no evidence that this was based on Plaintiff's race or age.  With respect to the GEAR-UP program, Plaintiff did not apply to work at the program.  With respect to the art portfolio program, the program was too small in reach to justify spending the School's limited budget on it.  With respect to the book-making competition, there is no evidence that a similar program was permitted for a younger or non-Black teacher.  As

discussed above, merely pointing to other younger and/or Hispanic teachers who did receive

per session income is insufficient in and of itself to infer discriminatory motive.

   In sum, no rational juror could find that Plaintiff was subject to a hostile work

environment based on her race or age in violation of Title VII or the ADEA.  Accordingly, I

respectfully recommend that Defendants' motion be granted with respect to Plaintiff's hostile

work environment claims.

### D.  Constructive Discharge

   A claim of constructive discharge is an allegation that, absent unendurable working

conditions, the plaintiff would not have resigned or retired.  Rather, the resignation or

retirement was forced.  *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).  Whether a

resignation or retirement can be deemed a constructive discharge is determined based on an

objective inquiry:  "Did the working conditions become so intolerable that a reasonable person

in the employee's position would have felt compelled to resign?"  *Id.*  The Second Circuit has

explained that a constructive discharge allegation can be understood as an aggravated hostile

work environment claim.  *Pistello v. Bd. of Educ. of the Canastota Cent. Sch. Dist.*, 808 Fed. App.

19, 24 (2d Cir. 2020) (summary order) (internal citation omitted).  That is, the hostile work

environment became so intolerable that the plaintiff was forced to leave the employer's

employ.  If a plaintiff fails to make out a claim of hostile work environment, no constructive

discharge claim can lie.  Accordingly, because I have recommended that Plaintiff's hostile work

environment claim be dismissed, I similarly recommend that her constructive discharge claim

be dismissed.

### E.  Retaliation

Retaliation claims under Title VII and the ADEA are analyzed under the same three-step burden shifting paradigm for the intentional discrimination claims discussed above. *Kwan v. Andalex Grp.*, 737 F.3d 834, 843 (2d Cir. 2013) ("[f]ederal . . . law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*"). The prima facie test differs in that the plaintiff must demonstrate that: (1) she engaged in protected activity; (2) defendant was aware of that activity; (3) plaintiff suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and that adverse action. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). Additionally, a retaliatory motive must be the but-for cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *Kwan*, 737 F.3d at 845 (Title VII); *Ninying v. New York City Fire Dep't*, 807 Fed. App. 112, 115 (2d Cir. 2020) (summary order) (the "conclusory allegation fails to state a retaliation claim under either the ADEA or Title VII, both of which required him to allege that his protected activity was the but-for cause of the adverse employment action").

The first two prongs of the prima facie case are not disputed. Plaintiff engaged in protected activity by filing her administrative charge with the SDHR and the EEOC on July 11, 2017, and the DOE was aware of the charge.

The alleged retaliation is Mercedes having sent Plaintiff disciplinary notices in May 2018 after having assured Plaintiff that all disciplinary cases against her were resolved. (MOL in Opp'n at 28.) In the retaliation context, there is a broader definition of what constitutes adverse action. Retaliation includes any employer action that is "materially adverse." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). This means any action that

"might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation omitted).  "Materially adverse" actions include more than employment actions such as denial of promotion, non-hire, denial of job benefits, demotion, suspension, discharge, or other actions that can be challenged directly as employment discrimination.  Retaliation includes an employer action that is work-related, or one that has no tangible effect on employment, or even an action that takes place exclusively outside of work, as long as it may dissuade a reasonable person from engaging in protected activity.  *Id.* at 63.  By contrast, a petty slight, minor annoyance, trivial punishment, or any other action that is not likely to dissuade an employee from engaging in protected activity in the circumstances is not "materially adverse." *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (citing *Burlington*, 548 U.S. at 68-69).

While a disciplinary notice or letter could constitute an adverse action in some situations, in this case there were no consequences to Plaintiff.  The notices simply included information and were based on information developed prior to the date when Plaintiff filed her charge of discrimination.  Additionally, the notices of discipline were sent nearly a year after Plaintiff's retirement and did not result in any consequences to Plaintiff.  Thus, these notices do not rise to the level of materially adverse actions on which a retaliation claim could be premised.  But, even assuming they could be deemed adverse actions, because the notices were supported by evidence developed prior to the date Plaintiff filed her charge and sent so long after she filed her charge, the mere sending of the notices is insufficient evidence from which a reasonable jury could conclude there was a retaliatory motive.  In other words, the timing is such that a retaliatory motive cannot be inferred.  Furthermore, given that the

evidence demonstrates Mercedes had an obligation to send the notices, there is a non-

retaliatory explanation for them being sent which Plaintiff has not contradicted with any

evidence.  Accordingly, Plaintiff has failed to established a prima facie case of retaliation.  *See*

*White*, 2014 WL 1273770, at *20 (granting summary judgment; letters supporting negative

rating sent after plaintiff filed administrative charge of discrimination not sufficient evidence of

retaliatory motive when evidence pre-dating charge supported the negative evaluation); *see*

*also Fahmy v. Duane Reade, Inc.*, No. 4-cv-1798 (DLC), 2006 WL 1582084, at *12 (S.D.N.Y. June

9, 2006) (holding, in part, that a reprimand letter received in July 2002 was sent too long after

protected activity that occurred in January 2002 to evince a causal connection for purposes of

establishing a retaliation claim) (internal citation omitted); *Clark County School Dist. v. Breeden*,

532 U.S. 268, 273-74 (2001) (citing cases where three and four-month gaps between protected

activities and adverse employment actions were insufficient to establish causation for a

retaliation claim).  Thus, summary judgment also should be granted as to Plaintiff's retaliation

claims.

<u>**CONCLUSION**</u>

For the reasons set forth above, I respectfully recommend that Defendants' motion for

summary judgment (ECF No. 72) be GRANTED in its entirety.

Respectfully submitted,

Date:   November 30, 2020
        New York, New York

KATHARINE H. PARKER
United States Magistrate Judge

40

<u>NOTICE</u>

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).

If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).  Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Katherine P. Failla at the United States Courthouse, 40 Foley Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Failla. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).